Present:  Carrico, C.J., Compton,[1] Lacy, Hassell, Keenan, Koontz, and Kinser, JJ.

JAMES S. GILMORE, III,
 GOVERNOR OF THE COMMONWEALTH
 OF VIRGINIA, ET AL.

v.  Record No. 990779

MICHELE P. FINN

                                    OPINION BY
                          JUSTICE LAWRENCE L. KOONTZ, JR.
                                  March 3, 2000

MICHELE P. FINN

v.  Record No. 990796

JAMES S. GILMORE, III, ET AL.


              FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                          Frank A. Hoss, Judge


     In these appeals, we consider whether the trial court erred in awarding sanctions pursuant to Code § 8.01-271.1, limited to the actual attorney's fees and costs incurred by the opposing party, against the Governor and the Commonwealth (hereafter collectively, the Governor) for filing a lawsuit that allegedly was neither "well grounded in fact [nor] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law."

_____

     [1]Justice Compton participated in the hearing and decision of this case prior to the effective date of his retirement on February 2, 2000.

BACKGROUND

On March 9, 1995, Hugh Finn was injured in an automobile accident. As a result of the accident, he suffered severe brain damage and required continuous nursing home care, including artificially administered hydration and nutrition through feeding tubes. At all times relevant to these appeals, Hugh Finn was a resident of Annaburg Manor Nursing Home in the City of Manassas.

In June 1998, Michele P. Finn, Hugh Finn's wife and legal guardian, determined that it would not have been her husband's wish that he be kept alive by artificial means, including the administration of hydration and nutrition, if there were no reasonable possibility of his recovering from a persistent vegetative state. Michele Finn then informed Hugh Finn's immediate family of her decision that pursuant to the provisions of the Virginia Health Care Decisions Act (the Act), Code § 54.1-2981 et seq., she intended to direct the medical staff at Annaburg Manor Nursing Home to withdraw this life-prolonging procedure from her husband. A series of legal actions between the various members of Hugh Finn's family followed. These legal actions were emotionally difficult for the family, ultimately became the subject of public debate and, indeed, led to the involvement of the Governor of Virginia.

A. The John Finn Lawsuit

Several members of Hugh Finn's immediate family disagreed with Michele Finn's decision. John Finn, Hugh Finn's brother, filed a chancery suit in the Circuit Court of Prince William County (the trial court) seeking a permanent injunction to prohibit the withdrawal of hydration and nutrition from Hugh Finn and to remove Michele Finn as Hugh Finn's guardian (the John Finn lawsuit). On July 17, 1998, the trial court granted a temporary restraining order prohibiting Michele Finn from taking action to withdraw the life-prolonging procedure being administered to Hugh Finn.

On July 29, 1998, the trial court held a hearing to consider John Finn's request for a permanent injunction and to remove Michele Finn as guardian. The trial court received testimony from Hugh Finn's neurologist, his physiatrist and Dr. Robin B. Merlino, his attending physician. The trial court found that the unanimous diagnosis of these three physicians provided "clear and convincing evidence that Hugh Finn has been and remains in a persistent vegetative state as defined in Va. Code § 54.1-2982, that can be characterized as a permanent vegetative state, meaning that, to a reasonable degree of medical probability, it is irreversible." The trial court further found that there was credible testimony from Michele Finn and in the de bene esse deposition of Kenneth L. Sales,

3

Hugh Finn's attorney, that Hugh Finn had on "multiple occasions before his tragic accident" expressed that "he would not wish to have his life artificially prolonged with artificial life sustaining medical treatment, and that he would specifically wish to have [artificially administered] nutrition and hydration withdrawn if he were in a persistent or permanent vegetative state."[2]

Addressing the provisions of the Act found in Code § 54.1-2986, the trial court found that Michele Finn had satisfied the requirement that she make "a good faith effort to ascertain the risks and benefits of and alternatives to the treatment and the religious beliefs and basic values of . . . the patient receiving treatment." The trial court further found that it was "impossible to communicate with Hugh Finn as a result of the permanent vegetative state" and, thus, it was appropriate for Michele Finn to "base[] her decision on [her husband's]

---

[2]Although not referenced in the trial court's order, the record reflects that the testimony of Hugh Finn's sister, Karen Finn, corroborated Michele Finn's and Sales' testimony. The evidence further showed that Sales had been asked by Hugh Finn to draft a Medical Directive, or "Living Will," expressing his desires a short time prior to his accident.

The trial court also reviewed the de bene esse deposition of John Collins Harvey, M.D., Ph.D., a Catholic physician theologian and expert on the subject of Catholic doctrines regarding euthanasia and related issues. Hugh Finn was a practicing Catholic prior to his incapacitation. Dr. Harvey expressed the opinion that Hugh Finn's wishes were not inconsistent with the doctrines of the Catholic faith.

4

religious beliefs and basic values and [his] preferences previously expressed . . . regarding such treatment."

Based upon these findings, the trial court determined that "the termination of [Hugh Finn's] medical treatment . . . including the withdrawal of [artificially administered] nutrition and hydration, is a medically appropriate, ethical treatment decision that is not inconsistent with Hugh Finn's personal wishes or his personal religious beliefs." Accordingly, the trial court concluded that John Finn had not satisfied his burden of demonstrating the likelihood of ultimately prevailing on the merits of a challenge to either the appropriateness of Michele Finn's decision or to her suitability as Hugh Finn's guardian.

In an order dated August 31, 1998, the trial court denied John Finn's request for a permanent injunction, dissolved the temporary injunction issued in the July 17, 1998 order, and dismissed John Finn's petition to remove Michele Finn as Hugh Finn's guardian. Although granting Michele Finn authority to proceed with her decision to direct the withdrawal of Hugh Finn's artificially administered hydration and nutrition, the trial court stayed that authority for 21 days.[3] The trial court

---

[3]The trial court subsequently amended the period of the stay to 30 days, that is, until September 30, 1998, to permit an appeal to this Court.

further required John Finn to pay one-half of the fees for the guardian ad litem appointed for Hugh Finn, one-half of the fees for the expert witnesses, and one-half of the attorney's fees and costs incurred by Michele Finn in defending the suit.

During the period of the stay imposed on Michele Finn by the trial court, John Finn filed a motion for reconsideration. In that motion, he asserted that new evidence had been acquired to show that his brother was not in a persistent vegetative state.

On September 21, 1998, the trial court held a hearing on that motion and reviewed the affidavit of Marie F. Saul, R.N., a utilization review nurse employed by the Commonwealth's Department of Medical Assistance Services. In that affidavit, Saul stated that while reviewing Hugh Finn's medical records, she attempted to communicate with him. After repeatedly saying "Hi" to him, Saul believed she heard him respond in a similar fashion. Saul further stated that she then persisted in attempting to communicate with Hugh Finn for over an hour, but received no further response, although she observed Hugh Finn "[s]moothing" his hair. Saul also testified at the hearing, essentially reiterating the statements in her affidavit.

By proffer, the trial court received evidence from Michele Finn that the Commonwealth's Department of Health and Human Resources had conducted its own investigation of Hugh Finn's

6

condition and that the Department's report concurred in the diagnosis of his treating physicians that Hugh Finn was in a persistent vegetative state. Michele Finn further proffered evidence that it was beyond the usual responsibility or training of a utilization review nurse, such as Saul, to make clinical observations or to report on the physical or medical condition of a patient. The evidence further showed that there had been no change in Hugh Finn's condition or in the diagnosis of that condition by his treating physicians since the entry of the August 31, 1998 order.

The trial court found that Saul's affidavit and testimony did not constitute new evidence and, moreover, "did not contradict a finding that [Hugh Finn] is [] in a persistent vegetative state" as previously determined by that court. Accordingly, the trial court denied the motion for reconsideration. John Finn was ordered to pay the additional fees and costs arising from the hearing on his motion.

B. Michele Finn's Motion to Prohibit Intervention by the Commonwealth

At various times following the July 29, 1998 hearing and continuing after the trial court's denial of John Finn's motion for reconsideration, agencies of the Commonwealth, apparently responding to requests from a relative of Hugh Finn and a member of the General Assembly of Virginia, made a series of

7

investigative visits to Annaburg Manor Nursing Home to examine Hugh Finn. These visits were conducted without the knowledge of Michele Finn and contrary to her express instructions that access to her husband be limited to family members and medical staff. On September 20, 1998, twenty members of the General Assembly released an informal declaration "In the Matter of Hugh Finn" in which they asserted that "the provision of comfort care as well as food and water should not be denied patients where such removal will be the underlying cause of death."

Under the aegis of the prior action filed by John Finn, Michele Finn filed a motion seeking an order to enjoin the Commonwealth from making further intrusions into her husband's privacy. The trial court conducted a hearing on Michele Finn's motion on September 25, 1998. At that hearing, the evidence showed that three physicians employed by the Commonwealth's Department of Health and Human Resources had examined Hugh Finn and determined that he was in a persistent vegetative state. The physicians had further stated in an interview with David Tucker, Administrator of Annaburg Manor Nursing Home, that removal of Hugh Finn's feeding tubes would have been warranted as much as a year and a half prior to the date of their examination. Additional evidence showed that the Commonwealth's physicians discounted Saul's report that Hugh Finn had actually responded to her efforts to communicate with him. The trial

court sustained the Commonwealth's demurrer to Michele Finn's motion on the ground that the Commonwealth was not a party to the John Finn lawsuit.

On September 28, 1998, Hugh Finn's family members who had opposed Michele Finn's decision to withdraw the life-prolonging procedure being administered to Hugh Finn agreed not to pursue further legal action. Accordingly, no appeal was taken from the judgment rendered in the John Finn lawsuit.

C. The Governor's Lawsuit

On September 30, 1998, James S. Gilmore, III, "acting in his official capacity [as Governor of the Commonwealth of Virginia] and in the name of the Commonwealth," filed a bill of complaint against Annaburg Manor Nursing Home, Dr. Merlino, and Michele Finn seeking a temporary restraining order and a permanent injunction to prohibit the respondents from withdrawing the administration of hydration and nutrition from Hugh Finn (the Governor's lawsuit). The Governor asserted in the bill of complaint that the suit was brought pursuant to Code § 2.1-49, which provides, in pertinent part, that "pursuant to his duty to protect or preserve the general welfare of the citizens of the Commonwealth, the Governor may institute any action, suit, motion or other proceeding on behalf of its citizens, in the name of the Commonwealth acting in its capacity as parens patriae, where he shall determine that existing legal

9

procedures fail to adequately protect existing legal rights and interests of such citizens."

In addition, it was asserted that the suit was brought pursuant to Code § 54.1-2986(E), which provides that:  "On petition of any person to the circuit court of the county or city in which any patient resides or is located for whom treatment will be or is currently being provided, withheld or withdrawn pertinent to this article, the court may enjoin such action upon finding by a preponderance of the evidence that the action is not lawfully authorized by this article or by other state or federal law."  (Emphasis added.)

The Governor, as pertinent to the present appeal, contended that Hugh Finn is "dependent upon the artificial administration of nutrition and hydration in order to survive" and that the withdrawal of this procedure "will initiate a process of dying which will cause Hugh Finn to die from starvation and/or dehydration."  Accordingly, the Governor further contended that "the Virginia Health Care Decisions Act . . . does not authorize the withholding of nutrition and hydration from Hugh Finn" because Code § 54.1-2990 expressly provides that "nothing in [the Act] shall be construed to condone, authorize or approve mercy killing or euthanasia, or to permit any affirmative or deliberate act or omission to end life other than to permit the natural process of dying."  The Governor further contended that

10

"[u]pon information and belief, Hugh Finn is not in a persistent vegetative state as defined under Code § 54.1-2982; however, even if Hugh Finn were in a persistent vegetative state, the Respondents would not be authorized under the Act . . . to withhold or withdraw the administration of nutrition and/or hydration" from Hugh Finn.

On October 1, 1998, the trial court held a hearing on the Governor's request for a temporary restraining order. At that hearing, the Governor, represented by the Office of the Attorney General, conceded that there was no new evidence to present in support of the contention that Hugh Finn was not in a persistent vegetative state and relied solely on Saul's affidavit. The Governor contended, however, that Hugh Finn's medical condition was not dispositive inasmuch as the principal contention of the bill of complaint was that the withdrawal of hydration and nutrition under the circumstances of the case was prohibited by Code § 54.1-2990.

Hugh Finn's guardian ad litem advised the trial court that there was new evidence in the form of a medical report prepared for the Department of Medical Assistance Services by Dr. Naurang S. Gill, which the guardian ad litem had obtained from the Office of the Attorney General. Dr. Gill's report confirmed the previous diagnoses of Hugh Finn's personal physicians and the physicians employed by the Department of Health and Human

11

Resources that Hugh Finn "had been and remained in a persistent vegetative state." Dr. Gill further opined "that [Hugh Finn's] chances of any meaningful recovery . . . are practically zero."

On the day the hearing was held, the trial court denied the Governor's request for a temporary restraining order. In that order, the trial court reviewed the prior proceedings and its factual findings in the John Finn lawsuit and then reiterated its prior determination that Michele Finn had "full authority under the Act, to withhold and withdraw life-prolonging medical procedures," including the artificial administration of hydration and nutrition. Addressing the argument that Code § 54.1-2990 prohibited the withdrawal of hydration and nutrition, the trial court concluded that "a person in a persistent vegetative state is, as a matter of law, in the natural process of dying within the meaning of [Code § 54.1-2990] and . . . the withholding and/or withdrawal of artificial nutrition or hydration from a person in a persistent vegetative state merely permits the natural process of dying and is not mercy killing or euthanasia with[in] the meaning of [Code § 54.1-2990]."

Pursuant to Code § 8.01-626, the Governor filed an emergency petition in this Court for review of the trial court's order. The Governor's sole assignment of error asserted that the denial of the motion for a temporary restraining order "was

12

error, and was based on an erroneous interpretation of Va. Code § 54.1-2990." Without conceding that Hugh Finn was in a persistent vegetative state, the Governor argued for reversal of the trial court's order on the ground that a person in a persistent vegetative state is not in the "natural process of dying," but rather that the withdrawal of hydration and nutrition would "initiate a dying process not previously present." Thus, the Governor contended, as he had in the trial court, that a plain reading of Code § 54.1-2990 would prohibit the withdrawal of hydration and nutrition from a person not otherwise in the process of dying from some other disease or condition. The Governor further contended that even if this Court were unwilling to construe the statute in this manner, the failure to issue the temporary restraining order deprived the parties of the opportunity "to make [a] more deliberate investigation" of Hugh Finn's condition, "whatever that condition may be."

By order entered October 2, 1998, we denied the Governor's emergency petition for review. In that order, we held that the "withholding and/or withdrawal of artificial nutrition and hydration from . . . a person in a persistent vegetative state[] merely permits the natural process of dying and is not mercy killing or euthanasia within the meaning of Code § 54.1-2990." Gilmore, et al. v. Annaburg Manor Nursing Home, et al., Order

13

Denying Emergency Petition for Review (October 2, 1998).  Hugh Finn subsequently died following the withdrawal of the life-prolonging procedure in question.

D. Michele Finn's Motion for Fees and Sanctions

On November 5, 1998, pursuant to Code § 8.01-271.1, Michele Finn filed in the trial court a motion seeking an award of fees and sanctions against the Governor, the Attorney General, and the attorneys in the Attorney General's office who had endorsed the pleadings in the Governor's lawsuit.  Michele Finn contended that the Governor's lawsuit was supported by "no law, nor facts, on which to base [the] claim for injunctive relief, and no standing to justify the Governor's intervention . . . when [the Governor and his counsel] brought this ill-advised, improvident and spurious lawsuit."

In a memorandum in opposition to this motion, the Governor responded to Michele Finn's motion contending that his lawsuit was filed in good faith and based upon a reasonable belief in the merits of both the factual assertion that Hugh Finn was not in a persistent vegetative state and the legal assertion that the Act did not permit the withdrawal of artificially administered hydration and nutrition from any person not otherwise in the natural process of dying.  In support of his assertion that the factual issue of Hugh Finn's medical condition was controverted and, thus, raised in good faith, the

14

Governor referenced Saul's affidavit.  In addition, for the first time the Governor cited medical studies on misdiagnosis of patients thought to be in a persistent vegetative state, an alleged failure to correct a problem with a drainage shunt intended to relieve pressure on Hugh Finn's brain, and reports from Annaburg Manor Nursing Home that Hugh Finn had demonstrated improvement in manual dexterity and verbal responsiveness to questions.  The Governor also supplied an affidavit of a lay Catholic minister who related that "tears came to Mr. Finn's eyes" when the minister told him he could not receive the physical Eucharist due to medical reasons and that Hugh Finn once "reached up and took [the minister's] hand" during prayer.

In support of his contention that his legal challenge concerning the construction of Code § 54.1-2990 was made in good faith, the Governor noted that this statute had not been authoritatively construed by the courts and contended that the statute was susceptible to two interpretations.  The interpretation advocated by the Governor was that the artificially administered hydration and nutrition merely compensated for Hugh Finn's inability to chew and swallow and could have sustained his life indefinitely.  Thus, he was not in the natural process of dying and the withdrawal of this life-prolonging procedure would have the effect of initiating a dying process in violation of the statute.  The second interpretation,

15

acknowledged by the Governor, was that because Hugh Finn was in a persistent vegetative state, he was already in the process of dying as a matter of law and, thus, the withdrawal of the life-prolonging procedure merely permitted that process to continue. Although conceding that the latter interpretation was ultimately adopted by the trial court and upheld by this Court, the Governor contended that at the time he filed suit his interpretation was "warranted by existing law or good faith argument for the extension, modification, or reversal of existing law such that the imposition of sanctions under Code § 8.01-271.1 would not be warranted." In addition, the Governor further contended that the imposition of sanctions would impermissibly invade executive decision-making and violate the separation of powers doctrine.

In a reply memorandum, Michele Finn contended that the Governor's basis for supporting his challenge to Hugh Finn's medically diagnosed condition was "unworthy of belief and ignores the prior findings of [the trial court], as well as the very results [of] the Governor's own investigation." She further contended that Code § 54.1-2990, when read in the context of the other definitions and provisions of the Act, was not reasonably subject to the interpretation advanced by the Governor and that in any case the issues of mercy killing and euthanasia had been litigated in the John Finn lawsuit.

16

On November 25, 1998, the trial court heard argument from the parties in support of their positions.  In summarizing its findings and conclusions, the trial court stated, "[T]he real issue in this case is whether or not the [Governor's] pleadings were well grounded in fact and warranted by existing law."  With respect to the Governor's argument that he had a good faith belief that the diagnosis of Hugh Finn's medical condition was controverted, the trial court found that the evidence cited by the Governor was too far removed in time to contradict the evidence that had been developed during the John Finn lawsuit. The trial court further found that the Governor had "simply glossed over" Dr. Gill's report that Hugh Finn was in a persistent vegetative state with almost no hope of improvement, which the trial court found "compelling on the issue of whether the Commonwealth, the Attorney General, or the Governor could, in good faith, argue otherwise."

The trial court further stated that "[t]here is precious little construction that needs to be made" when Code § 54.1-2990 is read in the context of the other definitions and provisions of the Act.  The trial court found that the Governor's assertion that this statute was subject to two constructions was not warranted by existing law and stated that this finding "is supported by the unprecedented manner in which this case was decided by a unanimous Supreme Court of Virginia within just a

17

few days of the signing of [the trial] Court's order."  In addition, with regard to the Governor's legal assertions concerning the Act, the trial court further stated that "[i]t seems clear to [this court] from all that [this court has] observed in this case since it gained such public prominence is that there are legislators, and apparently the Governor too, that do not favor this law.  This is certainly their prerogative.  But the challenge that should be mounted . . . is one to be made in the political arena and not in the court, and certainly not in the manner that it was done in this case."

The trial court further rejected the Governor's contention that any imposition of sanctions against him would impermissibly invade his executive decision-making prerogative and would violate the separation of powers doctrine.  The trial court assumed that Code § 2.1-49 provided the Governor with standing to bring the lawsuit in the name of the Commonwealth, but further reasoned that having thus submitted himself to the authority of the courts, the Governor could not claim executive privilege to avoid the consequences of that authority being exercised.

Accordingly, the trial court imposed on the Governor and the Commonwealth, jointly and severally, a compensatory sanction in the form of an award of attorney's fees and costs to Michele

18

Finn in the amount of $13,124.20.[4]  The trial court declined a request by Michele Finn that it assess a punitive sanction against the Governor, the Commonwealth, the Attorney General, and the attorneys in the Attorney General's office who had signed the pleadings, finding that a punitive sanction was not appropriate under the facts of this case.

The Governor and the Commonwealth filed a petition for writ of error in this Court asserting that the trial court had erred in rejecting the separation of powers doctrine argument, in considering evidence outside the record, in determining that the Governor's lawsuit was not well grounded in fact, and in ruling that the Governor's legal argument was sanctionable.  Michele Finn also filed a petition for writ of error asserting that the trial court erred in failing to assess a punitive sanction and in failing to assess liability for the compensatory sanction against the Attorney General and the individual attorneys who signed the pleadings.  We awarded appeals to both the Governor and Michele Finn.

### DISCUSSION

Our consideration of the trial court's imposition of sanctions under Code § 8.01-271.1 in this case necessarily

---

[4]The Commonwealth was further directed "not as a sanction but pursuant to appropriate statutory authority" to pay the guardian ad litem's fee of $2,731.00.  This assessment of the guardian ad litem's fee is not challenged in this appeal.

begins with a review of the other pertinent statutes that were the focal point in the proceedings below.  The Health Care Decisions Act, Code § 54.1-2981 et seq., as the name implies is a legislative response to and acknowledgement of the fact that a competent adult may decide not to undergo life-prolonging medical procedures in the event such person should have a terminal condition.  The right to make that decision is specially acknowledged in Code § 54.1-2983.  By its very nature, however, such a decision, while reasonable and perhaps even prudent in the abstract, in its application in a given case is of considerable concern and impact, not only to the terminally ill person, his family and physicians but, indeed, in a broad sense, to the welfare of all the citizens of this Commonwealth. This is so because society considers a human life to be unique and precious and, in the context of this Act, its termination is rightfully permitted only in "the natural process of dying."

When so viewed, the Act provides for various procedures to be followed to ensure that the decision of a terminally ill person not to undergo life-prolonging procedures is communicated to his physician at the appropriate time.  Under the best of circumstances, this is accomplished by an "advance directive" made by the person, and the Act provides in detail the requirements for such a medical directive.  See Code §§ 54.1-2983 and 54.1-2884.  In the absence of an advance directive,

20

Code § 54.1-2986 provides the conditions and requirements for permitting an attending physician, upon authorization of the guardian of the patient or other specified persons, to withhold or withdraw life-prolonging procedures.  Michele Finn, in her capacity as legal guardian of Hugh Finn, invoked this statute when she made the decision to direct her husband's physicians to withdraw the hydration and nutrition being artificially administered to him.

As we have previously noted, in addition to issues raised as to whether that decision was consistent with Hugh Finn's religious beliefs and his previously expressed preferences for treatment, this decision was challenged by some of Hugh Finn's family as not being consistent with the statutory definitions of a life-prolonging procedure in the specific context of Hugh Finn's medical condition.  Code § 54.1-2982 defines "Life-prolonging procedure" as "any medical procedure, treatment or intervention which (i) utilizes mechanical or other artificial means to sustain, restore or supplant a spontaneous vital function, or is otherwise of such a nature as to afford a patient no reasonable expectation of recovery from a terminal condition and (ii) when applied to a patient in a terminal condition, would serve only to prolong the dying process.  The term includes artificially administered hydration and nutrition."  (Emphasis added.)  The statute defines "Terminal

condition" as "a condition caused by injury, disease or illness from which, to a reasonable degree of medical probability a patient cannot recover and (i) the patient's death is imminent or (ii) the patient is in a persistent vegetative state." (Emphasis added.) The statute defines "Persistent vegetative state" as "a condition caused by injury, disease or illness in which a patient has suffered a loss of consciousness, with no behavioral evidence of self-awareness or awareness of surroundings in a learned manner, other than reflex activity of muscles and nerves for low level conditioned response, and from which, to a reasonable degree of medical probability, there can be no recovery."

In the John Finn lawsuit, Michele Finn prevailed on the factual and legal contentions that Hugh Finn was in a persistent vegetative state and, therefore, as a matter of law was in a terminal condition, and that the artificial administration of hydration and nutrition was a life-prolonging procedure the statute permitted her to direct to be withdrawn because it would serve only to prolong the dying process of her husband. No appeal was taken in that case. However, Code § 54.1-2990 which, in pertinent part, provides that "[n]othing in this article shall be construed to condone, authorize or approve mercy killing or euthanasia, or to permit any affirmative or deliberate act or omission to end life other than to permit the

22

natural process of dying" was neither asserted nor expressly considered in that suit. The Governor did not intervene in that suit and thus was not a party to it. Instead, the Governor filed a separate suit in which this provision of Code § 54.1-2990 was the focal point of his contention that, notwithstanding the provisions of Code § 54.1-2982, this statute as applied to Hugh Finn's circumstances required the conclusion that the withdrawal of the artificially administered hydration and nutrition was not permitted because that withdrawal would <u>initiate</u> a dying process because Hugh Finn was not otherwise in the process of dying. That contention was rejected by the trial court and by this Court on appeal.

It is then manifest that our consideration of whether sanctions were appropriately imposed upon the Governor in the present case is to be focused primarily upon the Governor's lawsuit and not the John Finn lawsuit. Accordingly, we turn now to the statutes and legal principles that guide our further analysis.

Initially we note that to the extent that Michele Finn challenged the Governor's "standing" to file suit in this case, that challenge is totally without merit. Code §§ 2.1-49 and 54.1-2986(E) provide that standing. The question is whether the Governor pursued the lawsuit in a fashion that was not in violation of Code § 8.01-271.1.

Code § 8.01-271.1, in pertinent part, provides that:

> The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> * * * *
>
> If a pleading, motion, or other paper is signed or made in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed the paper or made the motion, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper or making of the motion, including a reasonable attorney's fee.

We begin our consideration of the application of this statute to the present case with the proposition that the Governor is not above the law and, where appropriate, is fully subject to the imposition of sanctions under Code § 8.01-271.1. We also note that the Governor does not contend otherwise in this appeal.

We have previously identified some of the policy considerations in sanction cases. "The possibility of a sanction can protect litigants from the mental anguish and expense of frivolous assertions of unfounded factual and legal claims and against the assertions of valid claims for improper

24

purposes. . . . Yet the threat of a sanction should not be used to stifle counsel in advancing novel legal theories or asserting a client's rights in a doubtful case." Oxenham v. Johnson, 241 Va. 281, 286, 402 S.E.2d 1, 3 (1991). All of these policy considerations are facially implicated by the proceedings in this case.

"[W]e apply an abuse-of-discretion standard in reviewing a trial court's award or denial of a sanction." Id. at 287, 402 S.E.2d at 4. In making that review, we apply an objective standard of reasonableness in order to determine whether a litigant and his attorney, after reasonable inquiry, could have formed a reasonable belief that the pleading was warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. Nedrich v. Jones, 245 Va. 465, 471-72, 429 S.E.2d 201, 204 (1993).

There can be no real dispute that under an objective standard of reasonableness the Governor's allegation in his bill of complaint that "Hugh Finn is not in a persistent vegetative state" was not well grounded in fact after a reasonable inquiry into the facts available to the Governor and his counsel when the Governor's lawsuit was filed. However, this allegation appears in a single-count pleading, in conjunction with the legal assertion in the pleading that "even if Hugh Finn [is] in a persistent vegetative state, the Respondents would not be

25

authorized under the Act . . . to withhold or withdraw the administration of nutrition and/or hydration."  While the factual and legal viability of separate claims are individually assessed for sanction purposes, see Nedrich, 245 Va. at 472-79, 429 S.E.2d at 205-07, this factual allegation was not essential to the Governor's unitary legal theory concerning the asserted construction of Code § 54.1-2990 upon which, if correct, he could obtain the relief sought in his bill of complaint.

Accordingly, for purposes of the imposition of sanctions under Code § 8.01-271.1, we must consider whether there was a reasonable and good faith basis for the legal assertions in the Governor's pleading.  That consideration, as we stated in Nedrich, does not require that we decide that the Governor's pleading was actually warranted by existing law but, rather, whether the Governor could have formed a reasonable belief that his action was warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.  In other words, "the wisdom of hindsight should be avoided" in applying the appropriate objectively reasonable standard of review.  Tullidge v. Board of Supervisors, 239 Va. 611, 614, 319 S.E. 2d 288, 290 (1990).

While, as we have stated, the Governor is not above the law, the Governor is also not merely "any person" as

26

contemplated by Code § 54.1-1986(E) when sanctions under Code § 8.01-271.1 are at issue. Code § 2.1-49(B) provides:

> In accordance with subsection A and pursuant to his duty to protect and preserve the general welfare of the citizens of the Commonwealth, the Governor may institute any action, suit, motion or other proceeding on behalf of its citizens, in the name of the Commonwealth acting in its capacity as parens patriae, where he shall have determined that existing legal procedures fail to adequately protect existing legal rights and interests of such citizens.

This statute, for purposes of our present considerations, is more than a standing statute. It clearly acknowledges the Governor's duty, rather than a mere right, to protect the general welfare of all citizens of the Commonwealth. The trial court gave little significance to the duty of the Governor under this statute in exercising its discretion to impose sanctions in this case. We are of the opinion, however, that the duty placed upon the Governor is a highly significant factor to be considered in this and any case in which the appropriateness of sanctions against a Governor is at issue. No other litigant has the duty "to protect and preserve the general welfare of the citizens of the Commonwealth," including in this case the legal rights and interests of Hugh Finn. With regard to the imposition of sanctions, we do not suggest that the Governor's action is clothed with a dispositive presumption of reasonableness or good faith. Rather, we are of the opinion that when, as here, the Governor asserts a legal contention in

27

the context of fulfilling the duty to protect the welfare of one or all the citizens of this Commonwealth acting in the capacity as parens patriae, any doubts about the good faith of that action should be resolved in favor of the Governor's contention. It is only when the Governor's legal contention is totally without merit that his action is appropriately sanctioned. See, Tullidge, 239 Va. at 614, 391 S.E.2d at 290.[5]

It is undisputed that at the time the Governor filed his lawsuit he was advancing a novel legal theory in the sense that there was no prior authoritative construction of the Act. That authoritative construction was obtained by the Governor's lawsuit upon appeal to this Court. Accordingly, we are of the opinion that the trial court erred in giving any weight to the promptness with which we rejected the Governor's legal assertions of the proper construction of the Act. That decision addressed the merits of the Governor's legal argument and had nothing to do with whether it was objectively reasonable for the Governor to have made that argument. Moreover, the immediacy

---

[5]In this regard, however, we do not agree with the Governor's assertion that the doctrine of separation of powers is implicated in this case on the theory that an imposition of sanctions would have a "chilling effect" on the exercise of executive discretion provided by Code § 2.1-49(B). The logical extension of that contention would be the conclusion that the Governor's actions are not always required to be taken in good faith, as are the actions of any other litigant. Accordingly, we reject this contention.

28

with which that decision was rendered was mandated by the circumstances of the case.

Continuing, we are further of the opinion that the Governor's legal assertion that Code § 54.1-2990 prohibited the withdrawal of artificially administered hydration and nutrition in this case because such withdrawal would initiate the dying process rather than merely to permit the natural process of dying, while ultimately incorrect, was nevertheless not totally without merit.  It cannot be said that this interpretation had no reasonable possibility of being judicially adopted at the time this assertion was made in the trial court.  Thus, it cannot be said that the Governor's assertion that a conflict existed between the provisions of Code § 54.1-2990 and Code § 54.1-2986 lacked any objectively reasonable basis, and the trial court erred in holding otherwise.  See Nedrich and Tullidge, supra.

Finally, the record amply demonstrates that the Governor was not alone in advancing the contention that the withdrawal of artificially administered hydration and nutrition as the sole form of life-sustaining medical treatment was not permitted under the Act.  A significant level of public debate concerning the issue preceded the Governor taking action to intervene in the matter.  While Michele Finn asserts that the Governor's suit was motivated solely by some unidentified political objective,

the record does not support that assertion.  Moreover, assuming that the impetus for the Governor's suit may have been "politically" motivated to some degree, nonetheless after reasonable inquiry the Governor could have formed the reasonable belief that his suit was warranted by existing law or a good faith argument that his legal assertions might be adopted by the court.

Accordingly, we hold that, under the circumstances of this case, the trial court abused its discretion in imposing compensatory sanctions against the Governor and the Commonwealth under Code § 8.01-271.1.[6]

CONCLUSION

For these reasons, we will reverse the judgment of the trial court and enter final judgment in favor of the Governor and the Commonwealth.

> Record No. 990779 — <u>Reversed and final judgment</u>.
> Record No. 990796 — <u>Dismissed</u>.

---

[6]In light of this holding, the issues raised in Michelle Finn's appeal are now moot, and that appeal will be dismissed.