Present:  All the Justices

F. CARTER FLIPPO, ET AL.

v.  Record No. 002183    OPINION BY JUSTICE ELIZABETH B. LACY
                                      June 8, 2001
CSC ASSOCIATES III, L.L.C.

FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
Thomas B. Hoover, Judge

In this appeal, two members of a limited liability company seek reversal of a trial court's judgment entered in consolidated cases holding one of the members liable for a breach of fiduciary duty to the limited liability company, barring both members from performing as managers of the company, awarding compensatory and punitive damages, and imposing sanctions pursuant to Code § 8.01-271.1.  Because we conclude that there was no abuse of discretion by the trial court and no reversible error in the judgment, we will affirm that judgment.

I. Facts

T. Frank Flippo owned timberlands in Hanover, Caroline, King and Queen, and King William Counties.  On his death in 1974, these properties were devised to his three children, Arthur P. Flippo, F. Carter Flippo, and Lucy Flippo Wisely. Carter Flippo, as executor of the estate, managed the timberlands.  Lucy Flippo Wisely conveyed her interest in the timberlands to her three children, who held their interests in

the name of CSC Associates, a general partnership.  In 1988, Carter Flippo, Arthur Flippo, and CSC Associates created the Flippo Land & Timber Company Partnership, to own and operate the business.

In 1989, the Flippos and CSC Associates discussed amending the partnership agreement to address issues of partner withdrawal or death that were not covered in the existing partnership agreement.  A "restated partnership agreement" was drafted which contained specific provisions relating to the purchase of a member's shares by the remaining members upon the death or withdrawal of a member.  The restated partnership agreement eliminated a paragraph contained in the original partnership agreement allowing a partner to terminate the partnership unilaterally and receive an in kind distribution of the partnership's assets.  The restated partnership agreement, drafted by an attorney at the law firm of McGuire Woods Battle & Boothe L.L.P. (MWBB), was never executed.

In 1995, the Flippos agreed to permit CSC Associates to hold its interest in the partnership as a limited liability company, CSC Associates III, L.L.C. (CSC).  Flippo Land & Timber Company Partnership also was converted to a limited liability company, Flippo Land & Timber Co., L.L.C (FLTC).

2

CSC, Arthur Flippo, and Carter Flippo were the members of FLTC.  Carter Flippo was named manager of FLTC.

In 1997, Carter and Arthur Flippo considered creating individual limited liability companies to hold their interests in FLTC for estate planning purposes.  CSC rejected requests by the Flippos to allow them to hold their interests in FLTC through limited liability companies.  Carter Flippo then consulted with MWBB regarding other means by which they could implement their estate planning goals.  MWBB advised that Carter Flippo could resign from FLTC, thereby forcing its dissolution, or a joint venture could be formed between FLTC and Flippo Lumber Corporation.  Under the second approach, Carter Flippo, as manager of FLTC, could then transfer its assets to the joint venture, resulting in the dissolution of FLTC under the terms of FLTC's Operating Agreement.  MWBB advised the Flippos that limited liability companies could hold their interests in the new venture and that none of these actions would require CSC's approval under the Operating Agreement of FLTC.

The Flippos adopted the joint venture approach suggested by MWBB, and, in October 1998, Carter Flippo informed CSC by letter that, as manager of FLTC, he had accepted a proposal from Flippo Lumber Corporation for FLTC to enter a joint venture and had conveyed all of FLTC's property to the new

venture, Timber Enterprises, L.L.C. (Timber Enterprises). The letter also informed CSC that FLTC had "dissolved" under Article 13(a)(ii) of the Operating Agreement because FLTC had contributed all of its non-cash assets to Timber Enterprises. CSC was given the option of joining Timber Enterprises if it agreed to the terms of that venture's Operating Agreement.

As a result of these events, CSC filed a bill of complaint, individually and derivatively on behalf of FLTC, against Carter Flippo, Arthur Flippo, FLTC, Flippo Lumber Corporation, and Timber Enterprises. CSC sought to recover FLTC's assets, to remove Carter Flippo as manager of FLTC, to enjoin further efforts to dissolve FLTC or dispose of its assets, and to recover compensatory and punitive damages for breach of fiduciary duties by the Flippos. Prior to trial, Timber Enterprises returned the assets it had received from FLTC and the company was dissolved, thereby making the claims against it moot.

The Flippos filed a separate amended bill of complaint seeking the dissolution of FLTC and distribution of the assets in kind on three alternative bases: (1) under Code § 13.1-1047, because it was not reasonably practicable to carry on the business of FLTC; (2) reformation of Article 13 of the Operating Agreement based on mutual mistake; and (3) rescission of the Operating Agreement based on CSC's alleged

4

fraud in the inducement. The Flippos submitted "contingent resignations" which would be operative should the trial court grant them relief by determining that Article 13 allowed a member to resign under that Article and receive an in kind distribution of the member's share of the assets. CSC filed a motion for sanctions on the basis that the allegations of mutual mistake of fact and fraud in Counts Two and Three of the Flippos' amended bill of complaint were not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification, or reversal of the existing law.

The two suits were consolidated by agreement and an ore tenus hearing was held. In CSC's suit, the trial court held that Carter Flippo, assisted by Arthur Flippo, breached his fiduciary duties to and violated the Operating Agreement of FLTC in forming Timber Enterprises and in transferring FLTC's assets to that company. The trial court awarded CSC its attorneys' fees of $178,349.02 for prosecuting the action on behalf of FLTC. Compensatory and punitive damages of $12,860.64 and $350,000.00, respectively, were awarded against Carter Flippo. The trial court also prohibited the Flippos from serving as managers of FLTC and installed CSC in that capacity.

In ruling on the Flippos' amended bill of complaint, the trial court denied the request for dissolution of FLTC and for reformation or rescission of the Operating Agreement. Accordingly, the trial court also rejected the Flippos' "contingent resignations."  Finally, the trial court granted CSC's motion for sanctions, awarding an additional $9,166.75 in attorneys' fees.  The Flippos assign error to the trial court's determinations in both suits.

## II.  CSC's Suit

The Flippos assign error to the trial court's failure to afford Carter Flippo protection from liability for a breach of fiduciary duty pursuant to Code § 13.1-1024.1(B), to the award of punitive damages against Carter Flippo, to the removal of Carter and Arthur Flippo as managers, and to the designation of CSC as manager of FLTC.

### A.  Breach of Fiduciary Duty

The Flippos assert in their first three assignments of error that the trial court erred in failing to afford Carter Flippo the defense from liability contained in subsection (B) of Code § 13.1-1024.1 for acts the trial court held breached Carter Flippo's fiduciary duty to FLTC.[1]

---

[1] The Flippos do not challenge the trial court's determination that Carter Flippo's actions in forming Timber Enterprises and transferring FLTC's assets to that company constituted a breach of his fiduciary duty to FLTC.

6

Subsection (B) of Code § 13.1-1024.1 provides in pertinent part:

> B. Unless a manager has knowledge or information concerning the matter in question that makes reliance unwarranted, a manager is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:
>
> . . . .
>
> 2. Legal counsel, public accountants, or other persons as to matters the manager believes, in good faith, are within the person's professional or expert competence; . . . .

The Flippos assert that Carter Flippo relied on the legal advice he received from MWBB when he accepted Flippo Lumber Corporation's offer for a joint venture, created Timber Enterprises, and transferred FLTC's assets to the joint venture. Thus, the Flippos conclude that the trial court erred in imposing liability on Carter Flippo for a breach of fiduciary duties for acts taken in reliance on legal advice. The Flippos apply this Code section out of context.

A manager, like a corporate director, is required to discharge his duties in accordance with his "good faith business judgment of the best interests of the limited liability company." Code § 13.1-1024.1(A); see Code § 13.1-690(A). By virtually identical language, Code §§ 13.1-1024.1(B) and 13.1-690(B) afford managers and corporate

directors, respectively, protection from liability in the exercise of that good faith judgment under certain circumstances. We have held that a corporate director is entitled to such protection from liability under Code § 13.1-690(B) only for acts related to the exercise of business judgment on behalf of the corporation of which he or she was the director. Simmons v. Miller, 261 Va. 561, 544 S.E.2d 666 (2001). There is no basis to apply a different rule to managers seeking protection from liability under Code § 13.1-1024.1(B). In this case, therefore, to come within the protection of subsection (B) of Code § 13.1-1024.1, the legal advice which Carter Flippo received and acted upon must have been advice sought in good faith for the benefit of the company.

The trial court found that the legal advice sought by Carter Flippo was not related to the business interests of FLTC. MWBB was not representing FLTC when it advised Carter Flippo to transfer the assets of FLTC to Timber Enterprises. According to the trial court, MWBB was "representing their long-time clients, Carter Flippo and Arthur Flippo." Not only was the advice sought, delivered, and implemented for the personal benefit of the Flippos, Carter Flippo testified at trial that he thought the advice was not "very good" for FLTC.

8

The Flippos' argument that the advice upon which it acted involved acts which could "legally" be taken by a manager is irrelevant to the prerequisite for protection under Code § 13.1-1024(B) — whether an act was taken with the intent of benefiting the company. Furthermore, an act which is otherwise legal may, nevertheless, breach one's fiduciary duty. The advice relied and acted upon in this case was given solely for the purpose of implementing the Flippos' personal estate planning goals. Even if legal, the action was neither sought nor taken with the intent of benefiting FLTC and, in fact, had an adverse impact on the company. Following such advice cannot be the basis for a defense under subsection (B) of Code § 13.1-1024.1 to a violation of subsection (A) of that section.

The Flippos also complain that the trial court erred in imposing liability on Carter Flippo because MWBB was acting under a conflict of interest as defined by the Code of Professional Responsibility applicable to attorneys at the time. See Former DR 5-105(C). We disagree. Although the trial court suggested that MWBB had a conflict of interest because it represented both the Flippos and FLTC, such conflict did not affect the Flippos' motivation for seeking the advice, the advice given, and the decision to follow that advice. Carter Flippo's actions to further his estate

9

planning goals based on advice directed toward that end alone violated his fiduciary duty.  Any conflict of interest under which MWBB operated was immaterial to Carter Flippo's conduct.

Accordingly, we conclude that the trial court did not err in denying Carter Flippo the protection from liability afforded by Code § 13.1-1024.1(B).

## B.  Punitive Damages

The Flippos next assert that the trial court erred in awarding $350,000 in punitive damages against Carter Flippo because (1) there was no evidence of Carter Flippo's net worth, (2) reliance on advice of counsel should be a defense to punitive damages, and (3) the evidence was insufficient to show that Carter Flippo acted with malice or wantonness.

First, we reject the Flippos' contention that imposition of punitive damages was improper because there was no evidence of Carter Flippo's net worth.  The purpose of punitive damages is to punish the wrongdoer and warn others.  Smith v. Litten, 256 Va. 573, 578, 507 S.E.2d 77, 80 (1998).  Evidence of a party's net worth is admissible because it is material to this purpose and is relevant to a determination of the size of the award and whether it is so large as to be destructive.  Id.; The Gazette, Inc. v. Harris, 229 Va. 1, 50-51, 325 S.E.2d 713, 746-47, cert. denied sub nom. Fleming v. Moore, 472 U.S. 1032 (1985).  While evidence of net worth is relevant, the

10

appropriate amount of a punitive damage award can be established by other evidence, and the lack of evidence of the wrongdoer's net worth does not of itself defeat the punitive damage award.  In this case, the record showed that the estimated value of the assets of FLTC exceeded nine million dollars.  Carter Flippo's one-third interest in FLTC alone was sufficient to establish that the punitive damage award of $350,000 was not destructive.

Next, while some jurisdictions have allowed good faith reliance on advice of counsel to defeat the imposition of punitive damages, such reliance generally has been treated only as an appropriate factor to consider in determining whether the requisite malice or wantonness needed to impose punitive damages has been shown.[2]  We agree that good faith reliance on the advice of counsel is relevant, but it is not an absolute defense to the imposition of punitive damages. Cf. Pallas v. Zaharopoulos, 219 Va. 751, 755, 250 S.E.2d 357,

---

[2] See, e.g., Stanton v. Astra Pharm. Prods., Inc., 718 F.2d 553, 580 (3d Cir. 1983)("[P]unitive damages may be awarded 'only after consideration of the act itself, together with all the circumstances, including the motive of the wrong-doer, and the relations between the parties.'"); Hamilton County Bank v. Hinkle Creek Friends Church, 478 N.E.2d 689, 691 (Ind. Ct. App. 1985)("Several other jurisdictions have held that good faith reliance on the advice of counsel may prevent imposition of punitive damgages.  We agree . . . . However, such is not an absolute defense." (citations omitted)).

359 (1979) (good faith reliance on legal advice is absolute defense to charge of malicious prosecution).

Finally, the Flippos argue that the trial court based its award of compensatory damages on "the implementation of the Timber Enterprises 'scam'" and, therefore, the punitive damage award can stand only if Carter Flippo "made the Timber Enterprises 'scam' a reality 'with malice or wantonness.' " No such evidence is in the record, the Flippos contend, because MWBB, not Carter Flippo, conceived the Timber Enterprises "scam" and Carter Flippo simply followed the legal advice given by MWBB. Citing Simbeck, Inc. v. Dodd Sisk Whitlock Corp., 257 Va. 53, 508 S.E.2d 601 (1999), the Flippos assert that their actions in this case were not shown to be malicious or wanton, but were a legitimate "hard ball" response to CSC's refusal to allow the Flippos to transfer their interests in FLTC to limited liability companies and realize their estate planning goals.

However, the trial court found that the Flippos "weren't going [to MWBB] asking for advice as to what is in the best interest of the LLC, they were asking what was the best way to break this LLC after the younger members of the organization, CSC, had not done what they wanted them to do." This action, as characterized by the trial court, was "secretive, concealed, dishonest" and "an attempt to steal property worth

12

millions of dollars."  Punitive damages were assessed "because of that clearly dishonest conduct."

In reviewing this decision, we make an independent review of the record to determine whether it supports a finding of actual malice or wantonness by clear and convincing evidence. Williams v. Garraghty, 249 Va. 224, 236-37, 455 S.E.2d 209, 217 (1995).  The record in this case is clear that the actions taken by Carter Flippo were in response to CSC's refusal to agree that the Flippos' interests in FLTC could be held by limited liability companies.  The record is also clear that in order to realize their estate planning goals, the Flippos did not want to withdraw their interests from FLTC under Article 10 of the Operating Agreement, but wanted to maintain control of the timberlands which comprised the assets of FLTC.  To accomplish this objective, the Flippos sought and acted on advice that resulted in divesting FLTC of the timberlands as an asset.  The Flippos purposely concealed these actions from CSC; and the new venture, including ownership of the timberlands by Timber Enterprises, was presented to CSC as a completed transaction.

The Flippos argue that they did nothing illegal, but illegality is not the test for punitive damages.  Punitive damages may be awarded if a defendant acted with actual malice or such willful or wanton recklessness as to evince a

13

conscious disregard for the rights of others.  Booth v. Robertson, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988).  Here, the Flippos acted in conscious disregard of the interests of FLTC and CSC.  Furthermore, the fact that the scheme was devised by MWBB does not alter the underlying reason why the scheme was devised in the first place – the Flippos' desire to implement their estate planning goals regardless of the interests of FLTC and CSC and any duties they owed to those entities.

Accordingly, we conclude that the trial court did not err in awarding FLTC punitive damages against Carter Flippo.

### C.  Appointment of CSC as Manager of FLTC

In their sixth and seventh assignments of error, the Flippos assert that in removing Carter Flippo as manager of FLTC, disqualifying Arthur Flippo from serving as manager, and installing CSC as manager, the trial court exceeded its statutory authority and violated FLTC's Operating Agreement. CSC asserts that this issue has not been preserved for appeal, citing Rule 5:25.

The Flippos offer two grounds which they maintain place this issue properly before us.  First, they contend that they raised the issue of the trial court's lack of authority to take this action in their demurrer to Count Three of the bill of complaint.  In the demurrer, they asserted that Code

14

§§ 13.1-1024 and -1024.1 do not provide a cause of action for the disqualification or removal of a member from serving as the manager of a limited liability company. The trial court did not rule on the demurrer, but the Flippos assert that they properly preserved the issue for appeal because they objected to the final order which "granted the relief the demurrer challenged as inappropriate." The problem with this contention, however, is not only that the Flippos never sought a ruling on their demurrer, but also that the arguments presented to the trial court on this issue after the filing of the demurrer indicated that the Flippos abandoned any reliance on the grounds stated in the demurrer to defeat imposition of the relief sought by CSC in Count Three.

At trial, counsel for the Flippos did not argue that the trial court <u>could</u> <u>not</u> remove Carter and Arthur Flippo as managers. Rather counsel argued that he did not think "a case has been made" for requiring Carter Flippo to step down as manager or for dissociation of the Flippos. Counsel suggested that further restrictions would be appropriate only if the court were concerned about Carter Flippo's future actions as manager and advised that restrictions contained in the consent order entered by the trial court for the duration of the trial would be appropriate.

15

The Flippos' assertion that the evidence is insufficient to support CSC's claim admitted the court's authority to grant the relief sought and challenged only the proof burden of the party seeking the relief. At no point in oral arguments to the court, in post trial memoranda, or in objections to the final order did the Flippos refer to their previously filed demurrer or raise any objection to the relief sought by CSC in Count Three based on the trial court's lack of authority to remove or disqualify the Flippos as managers and to appoint CSC as manager of FLTC. Thus, we conclude that the mere filing of a demurrer and objecting to the final order under the circumstances of this case did not comply with the requirements of Rule 5:25 that objections must be "stated with reasonable certainty at the time of the ruling."

The Flippos also argue that these assignments of error are properly before us because they involve a challenge to the subject matter jurisdiction of the trial court and, therefore, can be raised at any time. Again we disagree. In this case, the trial court concluded that the Flippos had breached their fiduciary duties to FLTC and violated the Operating Agreement in doing so. Code § 13.1-1023(C)(1) authorizes a court of equity to enforce an operating agreement by relief "that the court in its discretion determines to be fair and appropriate." The Operating Agreement identified Carter and

16

Arthur Flippo as successive managers and also stated that "[a]ll Members shall participate in the management of the LLC, but they shall appoint one Member as a Manager." The trial court was charged with construing the Operating Agreement and enforcing it in a "fair and appropriate manner." Whether the enforcement of the Operating Agreement as construed by the trial court was "fair and appropriate" is a matter reviewable on appeal for its correctness, but the initial decision was fully within the subject matter jurisdiction of the trial court to consider in the first instance.

Accordingly, for these reasons we conclude that the issues raised in assignments of error six and seven were not properly preserved in the trial court, and therefore we do not consider them here. Rule 5:25.

### III. The Flippos' Suit

In their amended bill of complaint, the Flippos' sought the dissolution of FLTC and in kind distribution of its assets. In Count One, the Flippos asked that FLTC be dissolved pursuant to Code § 13.1-1047 because "it is not reasonably practicable to carry on the business" of FLTC under the Operating Agreement. In Count Three, the Flippos sought rescission of the Operating Agreement, alleging that CSC fraudulently induced the Flippos to agree to the Operating Agreement by representing that CSC's proposed changes to

17

Article 13 did not materially change the Operating Agreement. The Flippos allege such changes deprived them of a right to resign and receive a distribution in kind of their one-third interest in the assets. The trial court denied the Flippos' requested relief for dissolution and rescission, finding, respectively, that there was no evidence that the Operating Agreement adversely impacted the operation of FLTC's business and that CSC did not make any misrepresentations regarding the changes it proposed to Article 13 of the Operating Agreement. The Flippos have not assigned error to either of these holdings.

In Count Two of their amended bill of complaint, the Flippos asserted that "the parties were mutually mistaken as to the effect of the changes proposed by CSC to Article 13 and there was no meeting of the minds regarding that provision." In developing this position at trial, the Flippos presented evidence which, in their view, showed that provisions in the previous partnership agreements as well as in Article 13 of the current Operating Agreement were intended to, and did, allow a partner or member to resign, force the dissolution of the entity, and receive the distribution of the entity's assets in kind. To secure the relief requested under Count Two, dissolution and distribution in kind, the Flippos tendered their resignations from FLTC "contingent" on the

18

trial court concluding that dissolution and distribution in kind were authorized by the Operating Agreement. In response, CSC maintained that although such rights were included in the original partnership agreement, neither the restated partnership agreement nor the subsequent FLTC Operating Agreement ever contained a right to resign, force dissolution of the partnership, and receive distribution of partnership assets in kind.

The trial court found that Article 9 of the original partnership agreement for the Flippo Land & Timber Company Partnership specifically allowed a partner to terminate the partnership and receive a distribution in kind, but the court rejected the Flippos' contention that similar provisions were included in the unexecuted restated partnership agreement. The trial court found that CSC had no expectation that such rights were included or were supposed to be included in the restated partnership agreement or in the current Operating Agreement. Furthermore, the trial court found that the Flippos had no such expectation either. According to the trial court, the Flippos instead expected CSC to leave FLTC and be bound by the provisions of the Operating Agreement, which would have given the Flippos the right to purchase CSC's membership share at 85% of its appraised value. Thus, the trial court found that the only mistake harbored by the

Flippos was in the "prediction of things that are going to happen in the future."

Accordingly, the trial court held that "[t]here was no mutual mistake of fact or law among the Flippos and CSC regarding the FLTC Operating Agreement." The Flippos do not assign error to this holding. Rather, they assert that the trial court erred in its interpretation of FLTC's Operating Agreement, specifically that Article 13's reference to Article 9 entitles the remaining members to an opportunity to purchase the shares of a resigning member.

Article 13 has been characterized as unambiguous by the Flippos, CSC, and the trial court, although the construction of the provision varies with the reader. Article 13 states in relevant part that dissolution of FLTC occurs on "the death, resignation, bankruptcy, or dissolution of a Member, . . . unless, within 90 days of such event, the procedures of Article 9 are followed resulting in an election to continue the LLC . . . ."

Article 9 provides that on the death of a member, the remaining members may "elect to purchase" the interest of the deceased member, or, if such interest is not purchased, a majority of the remaining members "may elect to continue the LLC." If the remaining members "do not make either of these elections," the LLC will be dissolved.

20

The Flippos maintain that the word "election" in Article 13 refers only to the election in Article 9 to "continue the LLC" and does not include the election procedures in that Article regarding the right of the remaining members to purchase the departed member's shares.  We disagree with the Flippos.

In construing contracts, we apply familiar principles. "The primary goal in the construction of written contracts is to determine the intent of the contracting parties, and intent is to be determined from the language employed, surrounding circumstances, the occasion, and apparent object of the parties."  Christian v. Bullock,  215 Va. 98, 102, 205 S.E.2d 635, 638 (1974).

> It is the duty of the court to construe the contract made between the parties, not to make a contract for them, and "The polestar for the construction of a contract is the intention of the contracting parties as expressed by them in the words they have used."  Ames v. American Nat'l Bank, 163 Va. 1, 38, 176 S.E. 204, 216.  The facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made, may be taken into consideration as an aid to the interpretation of the words used, but not to put a construction on the words the parties have used which they do not properly bear. "It is the court's duty to declare what the instrument itself says it says."  163 Va. at 38, 176 S.E. at 216.

Seaboard Air Line R.R. Co. v. Richmond-Petersburg Turnpike Auth., 202 Va. 1029, 1033, 121 S.E.2d 499, 503 (1961).

21

In applying these principles, we first turn to the language of the Operating Agreement and then to the circumstances surrounding its execution. Article 9 refers to two types of elections, either of which, if followed, continues the LLC. The language of Article 13 refers to procedures "resulting in an election to continue the LLC." Without further limiting language, Article 13 does not eliminate the purchase election of Article 9. Furthermore, an interpretation that eliminates the election to purchase a departed member's share from Article 13 renders the provisions of that Article in conflict with Article 9. Both Articles refer to termination of the LLC on a member's death, and Article 9 unequivocally includes the election to purchase under such a circumstance.

The facts and circumstances surrounding the execution of the Operating Agreement and the "apparent object of the parties" support the above construction. There is no dispute that FLTC's Operating Agreement was to "mirror" the prior unexecuted restated partnership agreement. The trial court concluded that the resignation and in kind distribution rights sought by the Flippos were not contained in the restated partnership agreement. Because that agreement served as a basis for the current Operating Agreement, the absence of these rights in the Operating Agreement was consistent with

22

CSC's expectations. Thus, CSC's suggestion that a reference to the procedures of Article 9 be included in Article 13 was consistent with its position that resignation forcing distribution in kind was not a part of the restated partnership agreement. Article 13 already contained a provision allowing the members to elect to continue the LLC without purchasing the resigning member's share. Therefore, there was no need to add the Article 9 reference other than to bring Article 13 into compliance with CSC's understanding.

Finally, CSC specifically asked the Flippos and MWBB to review the suggested changes, including those made to Article 13, and inform CSC if any "are not acceptable." Neither the Flippos nor MWBB raised any question about the changes or indicated that they were not acceptable in any way.

Under the trial court's construction of Article 13, on the resignation of a member, FLTC would be dissolved unless the remaining members elected to continue it by purchasing the resigning member's shares or electing to continue it without such purchase by a vote of the remaining members. Whether the Operating Agreement is considered ambiguous or unambiguous, under the terms of the agreement and the record regarding the purpose of the parties and the circumstances surrounding its execution, the trial court's construction of Article 13 is

reasonable and we will affirm that portion of the trial court's judgment.

## IV. Sanctions

CSC filed a motion for sanctions based on the allegations of mutual mistake and fraud in Counts Two and Three of the Flippos' amended bill of complaint. The trial court awarded sanctions pursuant to Code § 8.01-271.1 in the amount of $9,166.75. The Flippos challenge the award of sanctions, asserting that the findings of the trial court were insufficient to support the sanctions and that the Flippos' theories of recovery were well grounded in fact and in law.

In reviewing a trial court's award of sanctions under Code § 8.01-271.1, we apply an abuse of discretion standard. In applying that standard, we use an objective standard of reasonableness in determining whether a litigant and his attorney, after reasonable inquiry, could have formed a reasonable belief that the pleading was well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and not interposed for an improper purpose. Gilmore v. Finn, 259 Va. 448, 466, 527 S.E.2d 426, 435-36 (2000).

The Flippos based their fraud count, Count Three, on a July 12, 1996 letter from CSC to MWBB and the Flippos. In that letter, CSC proposed changes to a draft of FLTC's

24

Operating Agreement, which it characterized as "housekeeping" items that had no material effect on the Operating Agreement. This characterization was a misrepresentation, the Flippos assert, because the additions were material and not merely "housekeeping." The trial court granted CSC's motion for sanctions, concluding that the fraud count was "an unjustified count," and rejecting the "idea that" CSC could defraud "these businessmen" who "had the assistance of an extremely experienced attorney, who was preparing the documents for their benefit."

An allegation of fraud requires a showing by clear and convincing evidence of an intentional and knowing misrepresentation of a material fact, made with the intent to mislead, and relied upon by another to his or her detriment. Elliott v. Shore Stop, Inc., 238 Va. 237, 244, 384 S.E.2d 752, 756 (1989). Here, the July 12, 1996 letter sent to MWBB and the Flippos containing CSC's alleged misrepresentations of fact stated in pertinent part:

> We have had our attorney review the document and some "oversights" and housekeeping items have been added (as shown in red). I would hope these are just housekeeping items and have no material affect [sic] on the agreement. Please let me know if any of these are not acceptable.

Applying the objectively reasonable standard recited above, we conclude that the language of this letter could not

25

support a reasonable belief that a pleading alleging fraud was well grounded in fact or law, regardless of whether the changes suggested resulted in a material change in the Operating Agreement.  First, the language of the letter, as CSC argues, states an opinion — the opinion of the writer that he "hope[s]" the changes are "just housekeeping items" and "hope[s]" the changes have no material effect.  Fraud cannot be predicated upon the mere expression of an opinion.  Tate v. Colony House Builders, Inc., 257 Va. 78, 82, 508 S.E.2d 597, 599 (1999).

Second, the letter invites MWBB and the Flippos to review the changes and to raise any objections regarding the changes. This invitation to consider the impact of the suggested changes is in direct conflict with the proposition that the changes were made with an intent to mislead, a prerequisite for a finding of fraud.  As stated by the trial court in ruling on the merits of Count Three, "[e]verything done by CSC . . . was above board, highlighted in red, done in writing. And to try to say that . . . [CSC] could mislead a sophisticated law firm or sophisticated attorneys who specialize in this type of work, and that [it] succeeded in doing that, is ridiculous."  Accordingly, we conclude that the trial court did not err in awarding sanctions pursuant to Code

26

§ 8.01-271.1 against the Flippos based on Count Three of their amended bill of complaint.

We note that the final order recited that sanctions were imposed for both Counts Two and Three and that $9,166.75 was incurred "in defending against the fraud and mutual mistake claims."  A review of the record shows, however, that the amount awarded was designated by CSC's counsel and accepted by the trial court as the amount of attorneys' fees incurred in defending only Count Three, the fraud count.  Because the attorneys' fees incurred in defending Count Two were not identified or separately claimed and the award made did not include any amounts claimed to have been incurred for defense of Count Two, we do not address the propriety of sanctions pursuant to the mutual mistake claim.  Oxenham v. Johnson, 241 Va. 281, 290, 402 S.E.2d 1, 6 (1991).

For the above reasons, we will affirm the judgment of the trial court.

Affirmed.