Present:  All the Justices

NORTHERN VIRGINIA REAL ESTATE, INC., ET AL.

v.  Record No. 101836    OPINION BY JUSTICE DONALD W. LEMONS
                                    January 13, 2012
KAREN MARTINS, ET AL.


FORREST WALPOLE

v.  Record No. 101844

KAREN MARTINS, ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan C. Thacher, Judge

In these appeals, we consider whether the Circuit Court of

Fairfax County erred when it imposed sanctions, pursuant to

Code § 8.01-271.1, against Northern Virginia Real Estate, Inc.

("NVRE"), its principal broker, Lauren Kivlighan ("Kivlighan"),

and their counsel, Forrest Walpole ("Walpole").

I. Facts and Proceedings Below[1]

In July 2007, NVRE and Kivlighan (together, "the

plaintiffs"), filed a four-count complaint against McEnearney

Associates, Inc., its real estate agent Karen Martins, and

David and Donna M. Gavin (together, "the defendants"), alleging

conspiracy to harm in business, interference with contract,

interference with contract expectancy, and defamation.

---

[1] The relatively tortuous path of complaints, demurrers,
motions, amended complaints, and other pleadings is recited
herein to illustrate why and how expenses and legal fees
ultimately accumulated.

Specifically, the plaintiffs' complaint alleged that: (1) Donna Gavin (acting as attorney-in-fact for her mother Bernadette A. Kennedy) signed a written 90-day exclusive listing agreement ("listing agreement") with NVRE for NVRE to sell certain real estate ("the Kennedy property") owned by the Bernadette A. Kennedy Living Trust ("the Trust"), Bernadette A. Kennedy and Donna M. Gavin, Trustees, in exchange for a five percent commission of the sales price; (2) the defendants knew of the listing agreement; (3) NVRE delivered a written purchase offer for $750,000 to Donna Gavin on May 5, 2007; (4) thereafter, the defendants formed a conspiracy and interfered with NVRE's listing agreement or contract expectancy, which caused Donna Gavin to terminate the listing agreement on May 8, 2007, and NVRE to lose the five percent commission when Kennedy's property was sold to buyers represented by McEnearney Associates, Inc. ("MAI") and Karen Martins ("Martins"). The plaintiffs sought $1 million in compensatory damages and $500,000 in punitive damages.

Regarding the defamation count, plaintiffs alleged that: (1) between May 4 and May 8, 2007, MAI and Martins falsely accused Kivlighan of "not working in the best interest" of the Kennedy property's owner and "discouraging [Martins] from submitting a written offer to purchase the [Kennedy] property"; (2) David Gavin falsely accused Kivlighan of "lying" to him and

2

Donna Gavin; and (3) the Gavins, writing to the Virginia Department of Professional and Occupational Regulation ("DPOR"), falsely accused Kivlighan of being "an untrustworthy agent" who "misrepresented her clients," and turned Kennedy's property into a "pocket listing." The complaint further asserted, within the defamation count, that plaintiffs were "likely to have evidentiary support after a reasonable opportunity for discovery."

The Gavins demurred to the defamation count and MAI and Martins moved for a bill of particulars. In a consent order, the trial court sustained the Gavins' demurrer to the defamation claims and granted MAI's and Martins' motion for a bill of particulars, and allowed plaintiffs to amend their complaint.

Plaintiffs subsequently filed an eleven-count amended complaint, alleging two counts each of conspiracy to harm in business and interference with contract expectancy against David Gavin, Martins, and MAI; three counts of defamation as to MAI and Martins; three counts of defamation as to David and Donna Gavin; and one count of defamation as to David Gavin, separately. The amended complaint included allegations that Martins stated in a May 8, 2007 letter to the Gavins that, "[m]y broker [(MAI)] had myself add certain verbiage to help protect you against your former obligation to the other agent,"

3

and that David Gavin told Martins, "I caught [Kivlighan] in a few lies."

The plaintiffs also filed a bill of particulars listing their damages as $168,000 (trebled to $504,000) – consisting of $37,500, which represented a five percent commission on the $750,000 purchase offer submitted to Donna Gavin by Kivlighan, plus $130,500, which represented a six percent commission on a future sale of the property for $2.175 million as a result of improvements the plaintiffs proposed their prospective buyer ("Alnifaidy") was going to make to the property.

Regarding conspiracy, the bill of particulars stated that, beginning May 5, 2007, David Gavin and Martins acted together to deny NVRE its commission when they: (1) engaged in "wrongful, slanderous attacks on the character and integrity of [Kivlighan] with the intent of destroying the confidence [Mrs. Gavin] had in her"; (2) caused Donna Gavin "to cease working with plaintiffs and to ignore [NVRE's] valid exclusive listing agreement"; (3) "in violation of law, failed to work through [NVRE] in connection with all offers to purchase the [Kennedy] Property"; and (4) "sought to duplicate the Alnifaidy $700,000 written cash offer for the [Kennedy] Property delivered by [NVRE] but under a 'For Sale by Owner' scheme" with a three percent commission to MAI.

MAI and Martins demurred to the plaintiffs' amended complaint as amplified by the bill of particulars, and the Gavins demurred to the plaintiffs' allegations of defamation, claiming absolute privilege because the statements they were alleged to have made "were made (if at all) in the course of a quasi-judicial proceeding." The trial court: (1) sustained MAI's and Martins' demurrer to defamation without leave to amend; (2) sustained the Gavins' plea of absolute privilege and dismissed the defamation counts involving their statements made to DPOR; (3) sustained David Gavin's demurrer to defamation; and (4) granted the plaintiffs leave to file a second amended complaint.

The plaintiffs filed an eight-count second amended complaint, again alleging two counts each of conspiracy to harm in business and interference with contract expectancy against David Gavin, Martins, and MAI; three counts of defamation against the Gavins as to their statements made to DPOR; and one count of defamation against David Gavin separately as to the statement he allegedly made to Martins, that he "caught [Kivlighan] in a few lies."

MAI and Martins demurred to the plaintiffs' second amended complaint, but the trial court overruled their demurrer. David Gavin also demurred to the conspiracy to harm in business and

interference with contract expectancy allegations but the trial court did not rule on his demurrer before trial.

Significantly, MAI and Martins asserted, in their answer to the plaintiffs' second amended complaint, a "Fifth Affirmative Defense," namely, that "[n]either Plaintiff ever had a contract with the owner of the Subject Property, nor did either Plaintiff have a reasonable contractual or business expectancy which could support a claim of tortious interference. A reply is requested pursuant to Virginia Rules 3:11 and 1:4(e)." The plaintiffs never replied to MAI's and Martins' fifth affirmative defense, and it was deemed admitted before trial. The case proceeded to a jury trial against MAI, Martins, and David Gavin on conspiracy to harm in business and interference with contract expectancy, and against David Gavin on the one count of defamation alleging that he told Martins, "I caught [Kivlighan] in a few lies."

At trial, the evidence demonstrated that: (1) Martins called Donna Gavin on May 2, 2007, and that Martins told Donna Gavin she had possible buyers for the home; (2) Donna Gavin told Martins that David Gavin would call her back "because we had a real estate agent and he could provide her with all the information"; (3) David Gavin returned Martins' call on May 3, 2007; and (4) David Gavin gave Kivlighan's phone number to Martins. Martins subsequently called Kivlighan, who told her

6

there was a full-price offer with a discounted commission for the Kennedy property, which Kivlighan thought that her clients would take. When Martins' prospective buyers (the "Wheelers") heard of the full price offer, they told Martins not to make an offer because they did not want to get into a bidding war.

On May 4, 2007, Kivlighan sent by facsimile a $730,000 offer from Alnifaidy to Donna Gavin. On May 5, 2007, David Gavin called Kivlighan, upset about the offer's conditions, including the fact that there was a home inspection contingency despite the cover sheet to the offer stating that the offer was for the Kennedy property "as-is" and that the offer included a four-point-one (4.1) percent seller subsidy, resulting in an actual offer of just over $700,000, not $730,000.

Thereafter, on May 5, 2007, David Gavin left a voicemail for Martins; Martins returned David Gavin's call the next day and told him, in response to his question why she had never submitted an offer on behalf of her interested buyers, that Kivlighan had discouraged her from submitting an offer. David Gavin told Martins that they were "in the process of terminating" Kivlighan. At trial, David Gavin denied saying he had caught Kivlighan "in a few lies," and Martins offered no evidence that Gavin made that statement. Both denied the allegation that Martins said Kivlighan was not working in the Gavins' best interest.

7

On May 7, 2007, Donna Gavin sent Kivlighan an electronic mail message stating that she would not accept Alnifaidy's offer unless it was resubmitted under different terms, including a reduction in the seller subsidy and clarification that the house would be sold "as-is." Donna Gavin also asked Kivlighan to "explain why Mr. Alnifaidy's Earnest Money [wa]s in the form of a Check [dated almost one and a half (1½)] months prior to m[y] signing [the listing agreement]."

Donna Gavin testified that, based on "what [she] saw in [Alnifaidy's offer and a conversation with her husband, she decided] to have an attorney look at th[e] contract. There's something just not right about it." As a result of the information she received from a lawyer, Donna Gavin concluded that she "had grounds to terminate [Kivlighan]," and on May 8, 2007, she sent Kivlighan written notice terminating the listing agreement.

Donna Gavin subsequently refused an increased offer from Alnifaidy, having received it from Kivlighan after she signed a contract to sell the Kennedy property to the Wheelers. Thereafter, the Kennedy property was sold to the Wheelers with a buyer's commission paid to MAI.

Significantly, Kivlighan admitted at trial that: (1) she was not owed a commission on Alnifaidy's offers; (2) MAI never had a listing agreement for the Kennedy property; and (3) she

8

never heard any telephone conversations between Martins and Donna or David Gavin. Alnifaidy testified that he never had any agreement with Kivlighan or told her that she could sell the Kennedy property for him in the future.

The defendants moved to strike the plaintiffs' evidence at the close of the plaintiffs' case-in-chief but, before the trial court ruled on the defendants' motion to strike, the plaintiffs moved to nonsuit, and the trial court granted the plaintiffs' motion to nonsuit as against all defendants. The defendants stated they intended to file motions for sanctions, and the trial court suggested that counsel for all the parties "confer. If there are any motions, decide a day that you want to argue . . . ." The defendants' counsel suggested "a suspending order of 30 days . . . just to be safe," and the trial court stated that "[t]hirty days is fine, or you can say until further order of Court. Whatever language you can agree on."

On April 30, 2008, the trial court entered an order which: (1) granted the plaintiffs' motion to nonsuit all counts; (2) dismissed the case as to all counts and all parties; and (3) further stated that "this Order is SUSPENDED until further order of this Court."

On July 11, 2008, the defendants filed motions for sanctions against the plaintiffs and plaintiffs' counsel,

9

Forrest Walpole ("Walpole"), seeking attorneys' fees and costs, and arguing that the plaintiffs violated Code § 8.01-271.1 "by filing this suit without any basis in fact, without support in law, and with improper purposes, all as prohibited by statute." In response, the plaintiffs and Walpole filed an opposition to the defendants' motions for sanctions, arguing that the motion for sanctions should be denied because the plaintiffs and plaintiffs' counsel "[i]n good faith and after reasonable inquiry . . . filed the claims for conspiracy, defamation and tortious interference with contract and contract expectancy when Defendants acted in concert to deprive NVRE of a commission and contract expectancy from the sale of [the Kennedy property]."

The trial court subsequently heard oral argument on the motions for sanctions, and the defendants submitted the billing records for their attorneys' fees and costs to the trial court. On March 17, 2009, the trial court issued a letter opinion explaining its rulings, and followed that on May 14, 2009, with a lengthy order granting the defendants' motions for sanctions.

Specifically, the trial court found that: (1) the complaint, by stating that the allegations were likely to have support "after reasonable opportunity for discovery," was a "per se" violation of Code § 8.01-271.1 under Ford Motor Co. v. Benitez, 273 Va. 242, 639 S.E.2d 203 (2007); (2) the

10

plaintiffs' claims "were filed out of a vindictive and malevolent desire to injure and intimidate a business competitor"; and (3) the plaintiffs lacked "any factual basis for their $135,000 claim to the 'second commission', and lack[ed] any basis for the $1.35 million defamation claims. Plaintiffs further lack[ed] a factual basis for a conspiracy claim."

Although the trial court's May 14, 2009 order stated that the defendants are entitled to sanctions, the order also stated that, "on this record, the Court is unable to determine the appropriate size of the sanction." As a result, the trial court continued the matter "to hear evidence and argument as to the quantum of sanctions and reasonableness of Defendant[s'] attorney's fees, respectively, whether the said expenses are related to the violations of the sanctions statute and to determine as against whom the respective sanction(s) should be assessed."

After an evidentiary hearing, at which the trial court heard voluminous testimony, both expert and otherwise, regarding the defendants' attorneys' fees, as well as Kivlighan's own testimony that she relied on Walpole's advice, the trial court issued a letter opinion and order on June 29, 2010, ordering the plaintiffs and Walpole, jointly and severally, to pay $113,778.06 to MAI and Martins, and

11

$158,318.40 to the Gavins. The trial court also ordered "that the Court's suspension of Plaintiffs' nonsuit taken on April [30], 2008 is lifted."

Specifically, the trial court found that: (1) the appropriate sanction in this case is the reasonable attorneys' fees and costs incurred by the defendants; (2) attorneys and their clients are both "required to act appropriately, ethically, and within the confines of the law when litigating cases in Virginia courts"; and (3) there is "substantial evidence of sanctionable behavior on the part of both the litigants and the[ir] lawyer." The trial court further opined that, "[Kivlighan's] actions showed a clear intent to support [filing] these claims, which were speculative at best . . . [m]oreover, her actions throughout the litigation are indicative of and establish the improper purpose with which she filed this lawsuit."

The trial court also rejected the plaintiffs' and Walpole's argument that the attorneys' fees and costs claimed by the defendants were unreasonable because: (1) the defendants failed to mitigate their damages; (2) defendants' counsel used block billing practices; and (3) the attorneys' fees incurred by the defendants were excessive. The trial court subsequently denied: (1) the plaintiffs' and Walpole's motions to suspend the June 29, 2010 order "to permit Plaintiffs [and Walpole]

12

adequate time to file their Motion[s] for Reconsideration and for the Court to consider and rule upon such motion[s]"; and (2) Walpole's motion for reconsideration and renewed motion for entry of a suspending order because "Walpole has not raised any issues not already considered in the matter."

NVRE, Kivlighan, and Walpole timely filed their notices of appeal and we granted these appeals on the following assignments of error:

For Northern Virginia Real Estate, Inc., et al. v. Karen Martins, et al., Record No. 101836:

1.  The trial court erred in awarding sanctions under Va. Code § 8.01-271.1 against NVRE, Kivlighan, and their trial counsel and in favor of Martins, MAI, Donna Gavin, and David Gavin when the trial court lacked jurisdiction to do so because the motions for sanctions were made, heard, and decided more than 21 days after entry of a nonsuit order, and the trial court lacked authority under Rule 1:1 of the Rules of the Supreme Court of Virginia to suspend the finality of the nonsuit order.

2.  The trial court erred in imposing sanctions under Va. Code § 8.01-271.1 against NVRE, Kivlighan, and their trial counsel, jointly and severally, rather than apportioning the sanctions among them based on their respective conduct relative to each of the parties that was awarded sanctions.

3.  The trial court erred in awarding sanctions under Va. Code § 8.01-271.1 against NVRE, Kivlighan and their trial counsel and in favor of Martins, MAI, Donna Gavin, and David Gavin because it abused its discretion by making its sanction determination based on post-filing factual findings, evidentiary rulings, hindsight, and improper considerations rather than an objective view of whether NVRE, Kivlighan, and their trial counsel, after reasonable inquiry, could have formed a reasonable belief that the Complaint,

13

Amended Complaint, Bill of Particulars, and Second Amended Complaint met the certification requirements of Va. Code § 8.01-271.1 at the time each was respectively filed.

For <u>Forrest Walpole v. Karen Martins, et al.</u>, Record No. 101844:

1. The trial court erred in awarding sanctions under Va. Code § 8.01-271.1 against Walpole, NVRE, and Kivlighan because it abused its discretion by making its sanction determination based on post-filing factual findings, evidentiary rulings, and other hindsight rather than an objective view of whether NVRE, Kivlighan, and Walpole, after reasonable inquiry, could have formed a reasonable belief that the Complaint, Amended Complaint, Second Amended Complaint and Bill of Particulars met the certification requirements of Va. Code § 8.01-271.1 at the time it was filed.

2. The trial court erred in determining the terms of and quantum of sanctions against Walpole, NVRE and Kivlighan because it did not properly consider the defendants' failure to mitigate, the billing practices of defendants' counselors, the punitive effect of the award, and ability to pay.

3. The trial court erred when it denied Walpole's motion for entry of a suspending order without giving Walpole the opportunity to present oral argument under Va. Sup. Ct. R. 4:15(d).

4. The trial court erred in awarding sanctions under Va. Code § 8.01-271.1 against NVRE, Kivlighan and Walpole when the trial court lacked jurisdiction to do so because the motions for sanctions were made, heard, and decided more than 21 days after entry of a nonsuit order, and the trial court lacked authority under Rule 1:1 of the Rules of the Supreme Court of Virginia to suspend the finality of the nonsuit order.

## II. Analysis

### A. Standard of Review

We have clearly articulated the standard of review for cases of statutory interpretation:

> [A]n issue of statutory interpretation is a pure question of law which we review de novo. When the language of a statute is unambiguous, we are bound by the plain meaning of that language. Furthermore, we must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity. If a statute is subject to more than one interpretation, we must apply the interpretation that will carry out the legislative intent behind the statute.

Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007) (citations omitted). Similarly, as a question of law, the interpretation of one of the Rules of this Court is subject to de novo review. See Brown v. Commonwealth, 279 Va. 210, 217, 688 S.E.2d 185, 189 (2010).

Additionally, in reviewing a trial court's award of sanctions under Code § 8.01-271.1, we apply an abuse of discretion standard. Flippo v. CSC Assocs. III, L.L.C., 262 Va. 48, 65, 547 S.E.2d 216, 227 (2001). We have stated that,

> [i]n applying that standard, we use an objective standard of reasonableness in determining whether a litigant and his attorney, after reasonable inquiry, could have formed a reasonable belief

15

> that the pleading was well grounded in fact,
> warranted by existing law or a good faith
> argument for the extension, modification, or
> reversal of existing law, and not interposed for
> an improper purpose.

Id. at 65-66, 547 S.E.2d at 227.  We have also held that "a
court's imposition of a sanction will not be reversed on appeal
unless the court abused its discretion in 1) its decision to
sanction the litigant, or 2) in the court's choice of the
particular sanction employed."  Switzer v. Switzer, 273 Va.
326, 331, 641 S.E.2d 80, 83 (2007).

## B. Rule 1:1

The plaintiffs argue that the trial court erred in
awarding sanctions against them and in favor of the defendants
because "the motions for sanctions were made, heard, and
decided more than 21 days after entry of a nonsuit order, and
the trial court lacked authority under Rule 1:1 of the Rules of
[this Court] to suspend the finality of the nonsuit order."
Specifically, the plaintiffs argue that the trial court was
without authority to suspend the nonsuit order because: (1)
there were no motions pending at the time of the nonsuit; (2)
"Rule 1:1 must be interpreted to prohibit trial courts from
generally suspending nonsuit orders to allow motions for
sanctions to be filed, heard, and decided more than 21 days
after [a] nonsuit is taken as a matter of right"; and (3) the
nonsuit order did not "clearly and expressly suspend the final

16

judgment that is obtained upon the granting of a motion for nonsuit."  We disagree and find these arguments without merit.

Rule 1:1 declares that "[a]ll final judgments, orders, and decrees, irrespective of terms of court, shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."

Significantly, for the purposes of this case, we have previously held that

> the provisions of Rule 1:1 are mandatory in order to assure the certainty and stability that the finality of judgments brings.  Once a final judgment has been entered and the twenty-one day time period of Rule 1:1 has expired, the trial court is thereafter without jurisdiction in the case.  Thus, only an order within the twenty-one day time period that clearly and expressly modifies, vacates, or <u>suspends</u> the final judgment will interrupt or extend the running of that time period so as to permit the trial court to retain jurisdiction in the case.

<u>Super Fresh Food Mkts. of Va., Inc. v. Ruffin</u>, 263 Va. 555, 563-64, 561 S.E.2d 734, 739 (2002) (some emphasis omitted). Additionally, we have noted that, "from its very nature, an order granting a nonsuit should be subject to the provisions of Rule 1:1," and "the concept of nonsuit is sufficiently imbued with the attributes of finality to satisfy the requirements of Rule 1:1."  <u>James v. James</u>, 263 Va. 474, 481, 562 S.E.2d 133, 137 (2002).

17

In this case, the trial court entered an order granting the plaintiffs a nonsuit on April 30, 2008. However, the trial court also expressly suspended the nonsuit order on that same date, pursuant to Rule 1:1, stating:

> This matter came to be heard on the 30th day of April, 2008, on the Plaintiff[s'] motion to nonsuit all counts and Defendants' oppositions thereto.
> Upon the matter presented to the Court at the hearing, it is hereby
> ADJUDGED, ORDERED, and, DECREED as follows:
> The Motion[] to Nonsuit is granted, and this case is dismissed as to all counts and all parties; and it is further
> ADJUDGED, ORDERED, and DECREED that <u>this Order is SUSPENDED until further order of this Court</u>.

(Emphasis added.) The trial court did so in order to entertain the defendants' motions for sanctions.

The trial court was well within its authority under Rule 1:1 to suspend the nonsuit order as it did and, by explicitly doing so, it properly retained jurisdiction in this case. Rule 1:1; <u>Super Fresh Food Markets</u>, 263 Va. at 563-64, 561 S.E.2d at 739. Accordingly, we hold that the trial court did not lack jurisdiction to consider and impose sanctions, as it did in this case, because the trial court properly suspended the nonsuit order within the 21-day period provided for in Rule 1:1. The trial court retained jurisdiction over this suit until 21 days after June 29, 2010 – the date upon which the

18

trial court lifted the suspension of the April 30, 2008 nonsuit order and entered the final order in this case.

C. Code § 8.01-271.1

Code § 8.01-271.1 provides that,

> every pleading, written motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name . . . .
>
> The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The statute further provides that if this rule is violated, the court "shall impose" an appropriate sanction upon the attorney, a represented party, "or both," and that such sanctions may include reasonable attorney's fees. Code § 8.01-271.1.

Accordingly, we must determine whether the trial court properly concluded that the plaintiffs and their attorney, after a reasonable inquiry, could not have formed a reasonable belief that the second amended complaint was well grounded in fact and warranted by existing law, or by a good faith argument for the extension, modification, or reversal of existing law. Flippo, 262 Va. at 65-66, 547 S.E.2d at 227. Significantly, we

19

have previously stated that a "trial court [is] not limited to the record in the present case, but [may] properly consider any relevant and admissible evidence tending to show the attorney's state of knowledge at the time in question."  Benitez, 273 Va. at 251, 639 S.E.2d at 207.

In this case, the second amended complaint was filed after the trial court allowed the plaintiffs to amend both their initial complaint and their first amended complaint. Nevertheless, the trial court noted, in its order granting the defendants' motions for sanctions, that "Plaintiffs' [sic] apparently have forgotten that many of their claims were dismissed on demurrer, and with prejudice."  The trial court further noted that,

> [a]t minimum, the filing of the initial complaint violated [Code § 8.01-271.1] by asserting in four numbered paragraphs that the allegations therein were likely to have support "after reasonable opportunity for discovery."  As this Court understands the Virginia Supreme Court's decision in Benitez, such a pleading is a per se violation of [Code] § 8.01-271.1.  Although the [plaintiffs'] amended complaint contained no such candid admission that its allegations were unsupported by fact, Plaintiffs lack any factual basis for their $135,000 claim to the "second commission", and lack any basis for the $1.35 million defamations claims.  Plaintiffs further lack a factual basis for a conspiracy claim.

Significantly, the trial court stated in its ruling granting the defendants' motions for sanctions:

20

The only claim Kivlighan ever advanced that was reasonably well grounded in fact, is a $37,500 contract claim. Instead of limiting the action to that claim Kivlighan and her counsel chose to advance at least three wildly speculative claims that lacked any basis in fact. These three claims dramatically increased the cost and duration of the litigation. Counsel's decision to pursue a three day jury trial in the face of a devastating ruling, that no contract existed between the parties, further increased the cost to the defendants, without any possible chance of success.

Standing alone, the Court might conclude that any of these claims were merely a mistake or an oversight by counsel, and might warrant only a mild sanction. However, the combination of so many frivolous claims, supported by such wild speculation, so virulently prosecuted even after any legitimate prospect of success had vanished, convinces the Court that the claims were not an oversight or mistake. The Court is of the firm conviction that they were filed out of a vindictive and malevolent desire to injure and intimidate a business competitor.

We hold that the trial court did not abuse its discretion in imposing sanctions in this case. Rather, the trial court correctly applied an objective standard of reasonableness in concluding that the facts of this case could not support a reasonable belief that the plaintiffs' claims alleging: (1) interference with contract expectancy; (2) conspiracy to harm in business; and (3) defamation; along with the damages sought, were well grounded in fact or law, as required by Code § 8.01-271.1.

21

### 1. Interference with Contract Expectancy

Significantly, the trial court noted that it "imposed a pleading admission on the Plaintiffs [just before trial] for failing to respond to [the] Defendants' properly propounded Fifth Affirmative Defense seeking a reply," that, "[n]either Plaintiff ever had a contract with the owner of the Subject Property, nor did either Plaintiff have a reasonable contractual or business expectancy which could support a claim of tortious interference.  A reply is requested pursuant to Virginia Rules 3:11 and 1:4(e)."  The trial court's ruling deemed the plaintiffs to have admitted the affirmative defense they failed to reply to and excluded any reference to, or evidence of, facts that conflicted with that admission.  Despite this damaging admission and the imposition of such "a devastating ruling," the plaintiffs "insisted on proceeding with a three day jury trial" on all of its claims, including the allegation that the defendants interfered with contract expectancy.

Specifically, the plaintiffs alleged total damages of $168,000 (trebled to $504,000) as a result of the defendants' interference with contract expectancy.  The plaintiffs further alleged that these damages consisted of $37,500, which represented a five percent commission on the $750,000 Alnifaidy purchase offer, plus $130,500, which represented a six percent

22

commission on the future sale of the property for $2.175 million as a result of improvements Alnifaidy was supposedly going to make to the property.

However, the trial court correctly found that, "[e]ven if Kivlighan did have a valid claim for a commission on the [Kennedy] property," Kivlighan would have realized "at most $37,500 from any contractual interest she acquired from the listing agreement" – and this is only "assuming that [Kivlighan's] pocket buyer's offer was accepted, and that she was paid both the buyer's and seller's agent commissions on the 'unsubsidized' contract price of the highest offer her buyer ever made." The trial court accurately noted that, "[i]n truth, [Kivlighan's] valid expectancy is probably limited to two-fifths of that amount [(or $15,000)], because [the listing agreement] provided for a seller's commission of only two percent."[2]

Moreover, the plaintiffs offered no evidence that could possibly lead the trial court to reasonably conclude that the plaintiffs ever had a factual basis for their claim for $130,500, which represented a six percent commission on the

_____

[2] Although the plaintiffs alleged that Donna Gavin signed the listing agreement with NVRE for NVRE to sell the Kennedy property in exchange for a five percent commission of the sales price, the listing agreement signed by Donna Gavin provided for a two percent commission to be paid to the selling broker and a three percent commission to be paid to the buyer's agency.

future sale of the Kennedy property for $2.175 million as a result of improvements Alnifaidy was going to make to the property. The trial court noted that, although Kivlighan claimed the loss of a commission from a second, future sale of the Kennedy property,

> based upon her contention that she was almost
> certain to obtain the listing for the [Kennedy]
> Property again after a new house was built[, h]er
> deposition testimony established that she lacked
> a factual basis to advance this theory.
> Furthermore, the testimony of Mr. Alnifaidy, both
> in his deposition and at trial, established that
> he had never engaged her as an agent to re-sell
> the [Kennedy] Property again in the future.
> Indeed, [K]ivlighan later admitted at trial that
> she was not engaged to re-sell the property.

Alnifaidy testified at trial that he never told Kivlighan he would let her sell the Kennedy property for him at a later date. The following exchange occurred during the defendants' cross-examination of Alnifaidy at trial:

> [Defendants' Counsel:] [Y]ou never had a
>     written agreement directly with Lauren
>     Kivlighan, correct?
>
> [Alnifaidy:] No.
>
> [Defendants' Counsel:] And [Kivlighan] was
>     never your real estate agent regarding  any
> property at any time[?]
>
> [Alnifaidy:] No.
>
> [Defendants' Counsel:] And you never    promised
> [Kivlighan] that she could be      your real
> estate agent[?]
>
> [Alnifaidy:] No.

24

[Defendants' Counsel:] That is correct?

[Alnifaidy:] That's correct.  Yes.

[Defendants' Counsel:] In fact, [Kivlighan]
     never asked you to be your real estate
     agent[?]

[Alnifaidy:] No.

Accordingly, we agree with the trial court's conclusion that,

> the claims [the plaintiffs] advanced for the
> "second commission" on a sale of the same
> property at (1) some unknown date an indefinite
> number of years in the future, by (2) a seller
> whose offer to purchase the property was twice
> rejected, to (3) a not even speculatively
> identified purchaser for (4) precisely $2.175
> million dollars, after (5) a contractor, whom the
> seller who did not yet own the home had not
> entered a contract with, would have torn down the
> existing structure and erected a mansion based on
> (6) unknown and unsolicited plans from an
> unidentified architect, are, to say it as kindly
> as possible, not "well grounded in fact and . . .
> warranted by existing law or a good faith
> argument for the extension, modification, or
> reversal of existing law."

Lastly, even if the plaintiffs may have had a valid contractual claim for a commission on the Kennedy property, it should be noted that the plaintiffs never filed suit against the actual owner of the Kennedy property, the Bernadette A. Kennedy Living Trust.  Rather, the plaintiffs repeatedly named Donna Gavin personally, and not in her representative capacity as Trustee, as a defendant in their complaint, amended complaint, and second amended complaint.  The record

25

demonstrates that they did so despite the fact that the plaintiffs were on notice, and actually knew, at the time they filed the second amended complaint that the Kennedy property was owned, at all relevant times, by the Trust.

Specifically, MAI and Martins stated in their memorandum in support of their demurrer to the second amended complaint that "title to the [Kennedy] property was actually held by the Bernadette A. Kennedy Trust, and not Bernadette A. Kennedy personally." The Gavins also stated in their memorandum in support of their demurrer to the second amended complaint that, as "admitted in the [s]econd [a]mended [c]omplaint in ¶ 29 . . . Bernadette Kennedy (in her personal capacity) was not the owner of the [Kennedy p]roperty, nor was . . . Donna Gavin." The plaintiffs, themselves, stated in ¶ 29 of the second amended complaint that "actual title to the [Kennedy p]roperty was in the Bernadette A. Kennedy Trust, Donna M. Gavin, Co-Trustee . . . pursuant to a deed from Bernadette A. Kennedy, dated April 11, 2007."

2. Conspiracy to Harm in Business

Regarding the plaintiffs' claims alleging conspiracy to harm in business, the trial court noted that, "[a]lthough [the] Plaintiffs' pleadings never clarified whether the business conspiracy claims were based on a common law right of action or the statutory cause authorized by [Code] § 18.2-499, [the]

26

Plaintiffs [took] the position that the action is for statutory conspiracy."  Statutory conspiracy requires "two or more persons [to] combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession."  Code § 18.2-499(A).  Moreover, "[i]n order to sustain a claim for this statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business."  Williams v. Dominion Tech. Partners, L.L.C., 265 Va. 280, 290, 576 S.E.2d 752, 757 (2003).

However, there is simply no factual basis to support the plaintiffs' allegation that David Gavin and Martins formed any agreement to harm the plaintiffs in business during their telephone conversations.  To the contrary, both David Gavin and Martins denied any agreement to cut Kivlighan out of the sale of the Kennedy property, and David Gavin testified that the calls were specifically prompted by the fact that Kivlighan only presented the Gavins with Alnifaidy's offer and had not presented them with the Wheelers' offer.

Additionally, the trial court correctly noted that the "Plaintiffs' entire factual basis for pleading conspiracy

appears to be the fact that David Gavin and [Martins] spoke to each other on the telephone, that David Gavin 'exhibited a hostile and mean spirited manner,' and that [Kivlighan] was discharged."  Accordingly, there is no factual basis to support the plaintiffs' allegation that David Gavin and Martins formed an agreement to harm the plaintiffs and no evidence that the defendants acted with malice.  As a result, we agree with the trial court's conclusion that "[n]o court could responsibly permit such a claim to go to the jury without evidence, and no attorney could responsibly plead such a claim without facts to support it."

### 3. Defamation

The plaintiffs' second amended complaint alleged that David Gavin told Martins, "I caught [Kivlighan] in a few lies," and the plaintiffs requested damages against David Gavin in the amount of $1 million, plus $350,000 in punitive damages. However, the plaintiffs offered no evidence that David Gavin actually spoke these words.

In fact, Kivlighan testified that she did not personally overhear any telephone conversations or any recordings of any telephone conversations between either Martins and David Gavin or Martins and Donna Gavin and that she "never personally heard [David Gavin and Martins] speaking."  Additionally, David Gavin

28

denied saying that he had caught Kivlighan "in a few lies," and Martins' testimony supported Gavin.

Furthermore, the plaintiffs' repeated defamation counts regarding the statements the Gavins allegedly made to DPOR demonstrate clearly that each of the plaintiffs' successively filed complaints lacked a proper basis in law and in fact. Specifically, Walpole should have known that the statements allegedly made by the Gavins to DPOR were privileged because they were made in the course of a quasi-judicial proceeding.

We have previously held that "false, misleading, or defamatory communications, even if published with malicious intent, are not actionable if they are material to, and made in the course of, a judicial or quasi-judicial proceeding." Lockheed Info. Mgmt. Sys. Co. v. Maximus, Inc., 259 Va. 92, 101, 524 S.E.2d 420, 424 (2000). Significantly, "[t]his absolute privilege has been extended to communications made in administrative hearings so long as the 'safeguards that surround' judicial proceedings are present." Id. (quoting Elder v. Holland, 208 Va. 15, 22, 155 S.E.2d 369, 374 (1967)). "Those safeguards include such things as the power to issue subpoenas, liability for perjury, and the applicability of the rules of evidence," all of which are present in proceedings before DPOR, an administrative agency of the Commonwealth of Virginia. Id. See Code §§ 54.1-300 through -311 (pertaining

to DPOR); Code § 2.2-4022 (providing that DPOR "may, and on request of any party to a case shall, issue subpoenas requiring testimony or the production of books, papers, and physical or other evidence"); Code § 2.2-4020 (providing that presiding officers at DPOR proceedings may "administer oaths and affirmations [and] receive probative evidence, exclude irrelevant, immaterial, insubstantial, privileged, or repetitive proofs, rebuttal, or cross-examination, rule upon offers of proof, and oversee a verbatim recording of the evidence"); and Code § 18.2-434 (providing that "[i]f any person to whom an oath is lawfully administered on any occasion willfully swears falsely on such occasion . . . he is guilty of perjury").

Nevertheless, the plaintiffs' complaint, amended complaint, and second amended complaint, all signed by Walpole, included three counts of defamation alleging that the Gavins, writing to DPOR, falsely accused Kivlighan of being "an untrustworthy agent" who "misrepresented her clients," and turned Kennedy's property into a "pocket listing." Inexplicably, the second amended complaint included these defamation counts after the trial court: (1) sustained the Gavins' demurrer to these counts in the original complaint and allowed the plaintiffs to amend their complaint; and (2) sustained the Gavins' demurrer and plea of absolute privilege

30

in relation to these defamation counts with prejudice, and allowed the plaintiffs to again amend their amended complaint.

Lastly, it should be noted that the trial court concluded that Kivlighan's "actions throughout the litigation [were] indicative of and establish[ed] the improper purpose with which she filed this lawsuit." In particular, the trial court observed that Kivlighan was "nonresponsive to counsels' questions both at her deposition . . . and when she took the witness stand throughout this litigation[, and] she constantly engaged in diatribes which were non-responsive and irrelevant," thereby demonstrating that "she filed this lawsuit out of a vindictive and malevolent desire to injure each of the [d]efendants and to intimidate a business competitor. Moreover, her behavior is indicative of the lack of a factual basis for bringing the [u]nderlying [a]ction."

The trial court also found that Kivlighan's testimony at the hearing to determine the reasonableness of the defendants' attorneys' fees "was evasive and misleading at times." For example, Kivlighan first testified that she only spoke to Walpole and one other attorney about the issues involved in the underlying action before filing suit. Additionally, Kivlighan testified that she did not meet with any other attorneys before filing this suit relative to her claim.

Upon cross-examination, defense counsel asked Kivlighan if she spoke to any other attorneys about the matter prior to consulting with Walpole. Kivlighan unequivocally denied such conversations. She was forced, however, to admit that this assertion was inaccurate and that she spoke to at least one other attorney about the case. The trial court noted that Kivlighan "attempted to justify the omission by claiming that she never attempted to retain [the other attorney]." However, the trial court was "not impressed by the excuse and note[d] yet another example of [Kivlighan's] lack of candor on the witness stand."

Accordingly, we hold that the trial court did not abuse its discretion when it imposed sanctions against NVRE, Kivlighan, and Walpole, based upon its conclusion that the plaintiffs' claims alleging interference with contract expectancy, conspiracy to harm in business, and defamation "lacked any basis in fact," and "were filed out of a vindictive and malevolent desire to injure and intimidate a business competitor."

D. The Imposition of Sanctions Jointly and Severally

The plaintiffs argue that the trial court erred in imposing sanctions "jointly and severally, rather than apportioning the sanctions among [NVRE, Kivlighan, and Walpole] based on their respective conduct." We disagree.

32

Code § 8.01-271.1 provides that,

> [i]f a pleading, motion, or other paper is signed or made in violation of this rule, the court . . . shall impose upon the person who signed the paper or made the motion, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper or making of the motion, including a reasonable attorney's fee.

(Emphasis added.) Significantly, in the circumstances of this case – in which the parties against whom sanctions were sought failed to provide the circuit court with evidence sufficient to permit it to make any distinction between those parties – Code § 8.01-271.1 does not require a court to allocate fault or apportion sanctions between a represented party and the party's attorney when the statute has been violated. Instead, Code § 8.01-271.1 expressly provides for sanctions to be imposed upon both a represented party and the party's attorney.

We have previously noted that, "it is apparent that the General Assembly had the opportunity to make discretionary a court's imposition of sanctions upon finding a statutory violation, but elected not to do so. Instead, it used the mandatory words 'shall impose . . . an appropriate sanction.' " Benitez, 273 Va. at 249, 639 S.E.2d at 206 (quoting Code § 8.01-271.1) (emphasis in original). Significantly, in this case, the trial court twice made written findings that NVRE,

33

Kivlighan, and their trial counsel were each culpable for several violations of Code § 8.01-271.1. Specifically, the trial court stated:

> [T]here is substantial evidence of sanctionable behavior on the part of both the litigants and the lawyer. The evidence has established that [Kivlighan] went to another lawyer, who advised her of a reasonable remedy that she may have had in this matter, a breach of contract action. That was simply not enough for Plaintiffs, and they continued to shop their case. [Walpole] offered Plaintiffs a grab bag of remedies. He then filed suit on behalf of Plaintiffs based upon these remedies, with a lack of basis in law or fact.
>
> [Kivlighan] was not a passive participant in this process. On the contrary, her actions showed a clear intent to support these claims, which were speculative at best.

The initial burden of proof rests with the party seeking the imposition of sanctions to prove that Code § 8.01-271.1 has been violated, and that sanctions and the amount thereof are appropriate. Significantly, we have held that,

> [a]s a general rule, confidential communications between an attorney and his or her client made in the course of that relationship and concerning the subject matter of the attorney's representation are privileged from disclosure. The objective of the attorney-client privilege is to encourage clients to communicate with attorneys freely, without fearing disclosure of those communications made in the course of representation, thereby enabling attorneys to provide informed and thorough legal advice.

Walton v. Mid-Atlantic Spine Specialists, P.C., 280 Va. 113, 122, 694 S.E.2d 545, 549 (2010) (citations omitted).

34

Accordingly, most of the information necessary to determine allocation of fault between attorney and client may be hidden by the attorney-client privilege. Consequently, when sanctions are imposed against represented parties and their counsel, and the sanctioned parties desire to seek allocation of fault or the apportionment of such sanctions, they carry the burden of providing the trial court with evidence sufficient to do so.

We are mindful of the difficulties which may arise when courts allocate sanctions between represented parties and their attorneys. Litigation involving the allocation of sanctions may pit attorney against client, as each tries to prove why the other is responsible for the sanctionable conduct. Disclosure of otherwise-privileged information may be an issue.

To avoid such a conflict of interest, however, other courts have suggested that, where sanctions have been imposed, and the attorney and client disagree about who is at fault and wish to assign blame to the other, the attorney should withdraw as client's attorney and both should obtain their own counsel. See e.g., Slane v. Rio Grande Water Conservation Dist., 115 F.R.D. 61, 62 (D. Colo. 1987) (explaining that the court "recommended that [the attorney] withdraw from his representation of [his clients and] obtain counsel for himself"); Anschutz Petroleum Mktg. Corp. v. Saybolt & Co., 112 F.R.D. 355, 360 (S.D.N.Y. 1986) (explaining that if the

attorney wished to contend that their client should pay all or part of the sanctions imposed, the attorney "will of course need to be represented by separate counsel"); Eastway Constr. Corp. v. City of New York, 637 F. Supp. 558, 570 (E.D.N.Y. 1986) (stating that, "[i]f attorney and client disagree about who is at fault and point their fingers at each other, the interests of the two are now clearly adverse. The client, therefore, will need new counsel to represent him against his former counsel in the proceedings to determine fault").

We agree with the trial court's conclusions that: (1) the plaintiffs "chose to advance at least three wildly speculative claims that lacked any basis in fact [and] dramatically increased the cost and duration of the litigation"; and (2) the combination of "so many frivolous claims, supported by such wild speculation, so virulently prosecuted even after any legitimate prospect of success had vanished [demonstrates] that the claims . . . were filed out of a vindictive and malevolent desire to injure and intimidate a business competitor."

The plaintiffs argue that the trial court erred by not "apportioning the sanctions among [NVRE, Kivlighan, and Walpole] based on their respective conduct," and that Walpole "should be punished, not his clients," because "[p]enalizing NVRE and Kivlighan for relying on their trial counsel does not further the goal of . . . Code § 8.01-271.1 nor does it serve

the ends of justice." However, the trial court expressly found that "the record does not conform with Plaintiffs' theory of the case. Instead, there is substantial evidence of sanctionable behavior on the part of both the litigants and the lawyer."

Consequently, because both Walpole and the plaintiffs violated Code § 8.01-271.1, and because the plaintiffs did not provide evidence necessary to demonstrate proper allocation of fault, we hold that the trial court did not abuse its discretion when it imposed sanctions against NVRE, Kivlighan, and Walpole, jointly and severally in this case.

### E. The Terms and Quantum of the Sanctions

Walpole argues the trial court erred in determining the terms and quantum of sanctions because it did not properly consider: (1) the defendants' failure to mitigate by not filing a motion for summary judgment; (2) the defendants' attorneys' billing practices; (3) the punitive effect of the award; and (4) the plaintiffs' ability to pay. We disagree.

In reviewing a trial court's award of sanctions under Code § 8.01-271.1, we have held that a court's imposition of sanctions will not be reversed on appeal "unless the court abused its discretion in 1) its decision to sanction the litigant, or 2) in the court's choice of the particular sanction employed." Switzer, 273 Va. at 331, 641 S.E.2d at 83.

37

It is important to state that this case is not a typical attorneys' fees award case. It is a sanctions case wherein the trial court has decided that a proper sanction would be based upon attorneys' fees incurred – a remedy expressly provided in the statute. Code § 8.01-271.1. Of course, proof of reasonableness is required. We draw guidance from our prior holdings regarding determination of reasonableness of attorneys' fees. We have held that,

> the fact finder must determine from the evidence the amount of the reasonable fees under the facts and circumstances of each particular case. The trier of fact must weigh the testimony of attorneys as to the value of the services, by reference to their nature, the time occupied in their performance, and other attending circumstances, and by applying to it their own experience and knowledge of the character of such services. On appeal the trial court's determination of the amount of the attorneys' fees to be awarded will be set aside only upon a finding of abuse of discretion.

Holmes v. LG Marion Corp., 258 Va. 473, 479, 521 S.E.2d 528, 533 (1999) (citations and internal quotation marks omitted).

In this case, David S. Mercer ("Mercer") testified for the defendants as an expert in the "reasonableness [and] necessity in attorney's fees." Specifically, Mercer testified that "the fees are eminently reasonable and rationally related to [this] case." Mercer further testified that he considered the "time and effort expended by all counsel on behalf of the defense, . . . the nature of the services rendered and the complexity of

38

those services," and "the value of the services to the defendants and the results obtained," in reaching his opinion. Also, Mercer testified that "the fees [in this case] were under market from [his] experience."

James C. Brincefield, Jr. ("Brincefield") testified for the defendants as an expert "in the field of attorney's fees, respectively with real estate litigation." Brincefield testified that "the fees were reasonable and necessary for the . . . defense of this case." Brincefield further testified that he considered "the time and effort expended by the attorneys, the complexity of the case, the experience of the attorneys, the reasonableness of their rates compared to the rates of other lawyers in the area, and the subject matter of the case" in forming his opinion.

Significantly, the plaintiffs and Walpole stipulated as to the reasonableness of the defendants' counsel's billing rate, and the trial court noted that "[t]he only question [that] remain[ed] [wa]s whether the number of hours spent on the case was reasonable." The trial court also noted that each defendant "provided the Court with the substantial legal bills that they incurred as a result of the litigation initiated by Plaintiffs."

Furthermore, in reaching its decision, the trial court considered the necessary factors, including the facts and

circumstances of each particular claim, the testimony of attorneys as to the value of the services, the nature of those services, the time occupied in their performance, and other attending circumstances, and applied its own experience and knowledge of the character of such services in reaching its decision.  See Holmes, 258 Va. at 479, 521 S.E.2d at 533.  The trial court ultimately determined that most of the amount requested by the defendants was reasonable and that awards of $113,778.06 in attorneys' fees to Martins and MAI, and $158,318.40 in attorneys' fees to the Gavins, were reasonable.

Notably, the trial court did find that certain fees were unreasonable, including a small amount of fees related to a counterclaim brought by the Gavins against the plaintiffs, certain fees connected to the number of hours counsel for the Gavins spent in preparing jury instructions for trial, and certain instances of duplicative and excessive billing.

We hold that the trial court did not abuse its discretion in determining the amount of the award of sanctions, particularly in light of the trial court's findings that: (1) the plaintiffs and Walpole "violated [Code § 8.01-271.1] when they filed the Underlying Action for an improper purpose and without a proper basis in law and in fact"; and (2) "the appropriate sanction is to hold both Mr. Walpole and his

40

clients jointly and severally liable for the reasonable attorney's fees and costs of Defendants."

F. Walpole's Motion for a Suspending Order

Walpole argues that the trial court erred when it denied his motion for entry of a suspending order without hearing oral argument thereon. We disagree.

Rule 4:15(d) provides that, "[e]xcept as otherwise provided in this subparagraph, upon request of counsel of record for any party, or at the court's request, the court shall hear oral argument on a motion." The rule "otherwise provide[s]" that "argument on a motion for reconsideration . . . shall be heard orally only at the request of the court." Rule 4:15(d).

On July 9, 2010, NVRE, Kivlighan, and Walpole filed motions for entry of a suspending order without requesting a hearing on those motions, stating that "the entry of a suspending order is necessary in order for Plaintiffs [and Walpole] to have adequate time to brief, file and argue their motion[s] for reconsideration and for the Court to consider and rule upon such a motion[s]." The trial court denied both motions on July 12, 2010.

Walpole subsequently filed a motion for reconsideration and renewed motion for entry of suspending order on July 13, 2010, arguing that Walpole had "multiple grounds for seeking

41

reconsideration of the [trial c]ourt's rulings," and "the entry of a suspending order is necessary in order for Walpole to have adequate time to fully brief and argue each point of reconsideration and for the Court to consider and rule upon such a motion." Walpole did not request a hearing on that motion. On July 15, 2010, the trial court denied Walpole's motion for reconsideration and renewed motion for entry of suspending order, stating that "Walpole has not raised any issues not already considered in [this] matter."

Walpole also filed a request for expedited hearing on July 15, 2010, in which he requested that the trial court schedule an expedited hearing on the previously filed motion for reconsideration and renewed motion for entry of suspending order "on or before July 20, 2010." The trial court did not rule on this request before it lost jurisdiction over this suit pursuant to Rule 1:1.

We hold that the trial court did not err in denying both Walpole's motion for a suspending order and Walpole's renewed motion for a suspending order without a hearing because it does not appear that Walpole requested a hearing on either motion before the trial court denied those motions. Additionally, Walpole repeatedly stated that he sought the suspension in order to file and argue a motion for reconsideration, for which

Rule 4:15(d) provides oral argument "only at the request of the court."  Rule 4:15(d).

### III. Conclusion

We hold that the trial court did not err when it imposed sanctions jointly and severally against NVRE, Kivlighan, and Walpole, pursuant to Code § 8.01-271.1.  Accordingly, we will affirm the judgment of the trial court.


Record No. 101836 – <u>Affirmed</u>.
Record No. 101844 – <u>Affirmed</u>.